**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE BATH & BODY WORKS, INC. SECURITIES LITIGATION** | : | **Case No. 2:26-cv-00039-MHW-SCS** |
| | : | **Judge Michael H. Watson** |
| | : | **Magistrate Judge S. Courter M. Shimeall** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ... 2

A. Defendants Launched Bath & Body Works's New Product Lines to Purportedly Bolster and Expand the Sale of Its "Core" Offerings ... 4

B. Defendants Turned to Unsustainable Promotions and Collaborations to Mask the Adjacencies' Poor Performance ... 5

C. Defendants Publicly Touted the Success of Bath & Body Works's New Product Lines, While Concealing Their Widespread Failure ... 6

D. Defendants Concealed Flailing Sales Performance Through an Undisclosed, Increasing Reliance on Unsustainable Collaborations and Promotions ... 9

E. The Truth Began to Emerge as Defendants Disclosed Reduced Sales and Margins, Resulting in Declines to Bath & Body Works's Stock Price ... 10

F. As Bath & Body Works's Performance Continued to Slide, Defendant Boswell Abruptly Stepped Down as CEO ... 11

G. On November 20, 2025, Defendants Shocked Investors by Admitting to the Adjacencies' Failure and Reliance on Short-Term Fixes to Drive Sales ... 12

II. JURISDICTION AND VENUE ... 15

III. PARTIES ... 16

A. Lead Plaintiff ... 16

B. Defendants ... 16

1. Corporate Defendant ... 16

2. Individual Defendants ... 17

C. Relevant Third Parties ... 19

IV. SUBSTANTIVE ALLEGATIONS ... 20

A. Bath & Body Works's Business ... 20

1. Bath & Body Works's "Core" Product Lines Drove Steady Growth and Investor Returns ... 21

2. Bath & Body Works's Business Model Involves Periodic Promotions and Collaborations that Carry Inherent Risk If Over Relied On ... 21

B. Leading Up to the Class Period, Defendant Boswell Took Over as Bath & Body Works's CEO and Directed Expansion into New Product "Adjacencies" ..... 22

C. From the Start of the Class Period, Defendants Misled Investors About the Success of Bath & Body Works's New Product Lines ..... 24

D. Former Employees' Accounts Support that Defendants Concealed the Failure of Bath & Body Works's Adjacencies Throughout the Class Period ..... 26

1. Before and Into the Class Period, Defendant Boswell Forced the Launch of New Product Lines that Failed and Weakened Core Sales ..... 26

2. When the Class Period Began in 2024, Bath & Body Works's New Product Lines Were Already Failing ..... 29

3. Defendants' Rigorous Internal Tracking of Sales and Inventory Made the Failure of Its New Products Readily Apparent ..... 30

4. Defendants Reported Numbers on Earnings Calls that Were Higher Than Internal Reports Reviewed by Former Employees ..... 32

E. Defendants Misled the Market About Promotions and Collaborations ..... 33

1. Defendants Misleadingly Told Investors that Bath & Body Works Was Not Increasing Its Reliance on Promotions to Drive Sales ..... 33

2. Defendants Concealed from Investors that Bath & Body Works Was Also Relying on Inherently Risky Collaborations to Meet Sales Targets ..... 36

F. As the Class Period Continued, Defendants Continued to Mislead Investors as to the Extent to Which the Adjacencies, Promotions, and Collaborations Were Driving Bath & Body Works's Success ..... 37

G. The Truth Began to Emerge through Incremental Disclosures Revealing Bath & Body Works's Poor Sales Performance as CEO Boswell Abruptly Resigned ..... 39

1. On February 27, 2025, Defendants Revealed Reduced Guidance and Operating Margin ..... 39

2. As the Company's Performance Slid Further, Defendant Boswell Unexpectedly Stepped Down as CEO ..... 41

3. On August 28, 2025, Defendants Revealed Increased Sales Weakness ..... 42

H. On November 20, 2025, Defendants Fully Revealed the Truth Behind Bath & Body Works's Poor Performance ........ 43

I. Post-Class Period Admissions and Events ........ 45

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........ 46

A. February 29, 2024 – 4Q 2023 Earnings Call ........ 47

B. March 12, 2024 – Bank of America Consumer & Retail Conference ........ 51

C. June 4, 2024 – 1Q 2024 Earnings Call ........ 52

D. August 28, 2024 – 2Q 2024 Earnings Call ........ 54

E. November 25, 2024 – 3Q 2024 Earnings Call ........ 55

F. December 4, 2024 – Morgan Stanley Global Consumer & Retail Conference ........ 57

G. February 27, 2025 – 4Q 2024 Earnings Call ........ 58

H. March 14, 2025 – Annual Report FY 2024. ........ 60

I. August 28, 2025 – 2Q 2025 Earnings Call ........ 61

VI. LOSS CAUSATION/ECONOMIC LOSS ........ 61

A. February 27, 2025—First Partial Corrective Disclosure/Materialization of the Concealed Risk ........ 63

B. August 28, 2025—Second Partial Corrective Disclosure/Materialization of the Concealed Risk ........ 64

C. November 20, 2025—Final Corrective Disclosure/Materialization of the Concealed Risk ........ 66

VII. ADDITIONAL INDICIA OF SCIENTER ........ 67

A. Defendants' Admissions Support an Inference of Scienter ........ 68

B. The Accounts of FEs of Bath & Body Works Support an Inference of Scienter ........ 69

C. Defendants' Class Period Misstatements Themselves Support a Strong Inference of Scienter ........ 72

1. Defendants' Statements Regarding the Purported Success of Bath & Body Works's Adjacencies Support a Strong Inference of Scienter ........ 72

2. Defendants' Statements Regarding the Company's Degree of Reliance on Promotions and Collaborations Support a Strong Inference of Scienter ........ 73

D. The Individual Defendants' Suspiciously Timed Departures Support an Inference of Scienter ........ 74

VIII. CONTROL PERSON ALLEGATIONS ........ 75

IX. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........ 76

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 78

XI. CLASS ACTION ALLEGATIONS ........ 80

XII. CLAIMS FOR RELIEF ........ 82

COUNT I For Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants ........ 82

COUNT II For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ........ 84

XIII. PRAYER FOR RELIEF ........ 85

XIV. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS ........ 85

JURY TRIAL DEMANDED ........ 85

Lead Plaintiff West Virginia Investment Management Board ("Lead Plaintiff" or "West Virginia IMB"), brings this Action on behalf of itself and all persons and entities who or which, during the period from February 29, 2024 through November 19, 2025, inclusive (the "Class Period"), purchased the publicly traded common stock of Bath & Body Works, Inc. ("Bath & Body Works," "BBWI," or the "Company"), and were damaged thereby (the "Class"),[1] against Defendants Bath & Body Works, Gina Boswell ("Boswell"), Daniel Heaf ("Heaf"), Julie Rosen ("Rosen"), and Eva C. Boratto ("Boratto") (the "Individual Defendants," and collectively with Bath & Body Works, "Defendants").

The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: filings by Bath & Body Works with the Securities and Exchange Commission ("SEC"); securities analysts' reports about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of Bath & Body Works with knowledge of the matters alleged herein, cited as Former Employees or "FEs"; and financial research platforms.[2] Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiff believes that substantial additional

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Bath & Body Works during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Bath & Body Works's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

[2] Emphasis added unless otherwise noted.

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Lead Plaintiff alleges as follows:

## I. SUMMARY OF THE ACTION[3]

1. For decades, Bath & Body Works relied on its "core" products—including scented candles, lotions, and fragrance sprays—to drive sales. However, after hiring Gina Boswell as CEO in December 2022, Defendants began aggressively marketing new product categories in an attempt to drive customer growth. These new product lines, referred to as adjacencies, focused on laundry, hair care, lip care and men's grooming (hereinafter "New Product Lines" or "Adjacencies"). Defendants touted the purported success of these New Product Lines and led investors to believe that the Adjacencies were, in fact, helping to drive Bath & Body Works's financial performance.

2. What was known to Defendants at the time, but intentionally concealed from investors, was that these New Product Lines were an abject failure. As the Company later admitted and the accounts of former Bath & Body Works employees confirm, the Adjacencies were not selling and did not drive customer growth as Defendants had represented. Despite this business reality, Defendants repeatedly misled investors throughout the Class Period by telling the market that these New Product Lines "***bring in new customers***," "***increase share of wallet with our existing customer***," and were "***delivering as we expected and there's a strong delivery there***."

3. Also unbeknownst to investors, as the failed Adjacencies began to impact the Company's financials, Defendants resorted to unsustainable, temporary stopgaps to cover up the massive losses. Specifically, as a deluge of unsold inventory from the New Product Lines built up in warehouses, Defendants masked this poor performance by increasing Bath & Body Works's

---

[3] As set forth fully in Section V, *infra*, Lead Plaintiff alleges that the statements highlighted in bold and italics were knowingly or recklessly materially false and misleading, affirmatively or by omission.

reliance on brand-deflating promotional measures to unsustainably generate near-term sales, including issuing steep discounts and resorting to volatile, hit-or-miss product collaborations. Despite knowing that the Company was increasing its reliance on promotions and collaborations to cover up the flailing sales of their highly touted New Product Lines, Defendants continued to mislead investors by stating that Bath & Body Works was "***no more promotional than we were last year***" and falsely claimed that collaborations were "***growing the core***."

4. Ultimately, Defendants were no longer able to conceal the Company's poor sales results through unsustainable gimmicks. In early 2025, Bath and Body Works abruptly announced the departure of Defendant Boswell as CEO and named Defendant Daniel Heaf as her replacement. While, at first, Heaf continued to downplay the negative impact the Adjacencies were having on the Company's performance, by November 2025 he was forced to admit that the Adjacencies had been a wholesale failure. Specifically, on November 20, 2025, Heaf shocked investors by blatantly admitting that the Adjacencies "**did not grow our customer base**" and that the Company's increased reliance on promotions and collaborations had "**masked**" sales gaps, been "**used to carry quarters**," and caused "**diminishing returns and erod[ing] brand equity**." But Defendant Heaf was not done. Weeks later, on December 3, 2025, he elaborated on his earlier admissions and confirmed that, throughout the Class Period, the Adjacencies were "**not successful**" and "**didn't bring new consumers to the brand**."

5. In the wake of Defendants' admissions, analysts expressed shock at "**the magnitude of the reset**" and took the view that Bath & Body Works's "path to improved fundamentals is . . . **potentially permanently out of reach**." Over the course of the Class Period, Defendants' revelations caused Bath & Body Works's stock to fall by more than **69.5%** and

eliminated over **$8.3 billion** or **72%** of the Company's market capitalization. This securities class action seeks to recover those losses on behalf of the defrauded investors.

### A. Defendants Launched Bath & Body Works's New Product Lines to Purportedly Bolster and Expand the Sale of Its "Core" Offerings

6. Bath & Body Works is primarily a brick-and-mortar, fragrance-focused business that sells home and body care products. Historically, Bath & Body Works drove sales through its "core" products, including scented candles, fragrance sprays, and body care products such as soaps and lotions. These core products were the primary driver of sales within the Company's customer base.

7. However, after years of stagnant growth and little innovation, Bath & Body Works was set for a major refresh. In December 2022, Defendant Gina Boswell became CEO of Bath & Body Works and spearheaded a new strategy: the introduction of several New Product Lines, known as "Adjacencies." Although these new product launches often borrowed from Bath & Body Works's fragrances and branding, the products themselves were brand new to the Company and within categories that the Company had not historically or successfully sold.

8. During the Class Period, the Company primarily offered four categories of new products: (i) laundry; (ii) hair care; (iii) lip care; and (iv) men's grooming. Because these New Product Lines were offered in addition to Bath & Body Works's core categories, they were designed and touted by Defendants to drive new growth by both: (i) bringing in new customer demographics; and (ii) expanding customers' total purchase by adding to their "baskets" at the time of purchase.[4] Bath & Body Works began rolling out these New Product Lines leading up to the Class Period, in 2023.

---

[4] Bath & Body Works often refers to a customer's total purchase as their "basket," and describes customers adding more products to their purchase as expanding their "basket" or "basket size."

9. Critically, Defendants touted that these New Product Lines were designed to be additive to customers' purchases of Bath & Body Works's core products, rather than siphon resources away from them. For example, on May 18, 2023, Defendant Boswell explained that Bath & Body Works was "focused on leveraging [its] core strengths in fragrance and innovation to extend [its] product leadership into adjacent categories."

10. As a result, Bath & Body Works's ability to retain and expand its customer base was key to the Company's success, especially as it launched and promoted its New Product Lines. Indeed, throughout the Class Period, Defendants falsely assured investors that the Company's Adjacencies were driving higher sales with existing customers and bringing in new customers to shop at Bath & Body Works despite their widespread failure.

### B. Defendants Turned to Unsustainable Promotions and Collaborations to Mask the Adjacencies' Poor Performance

11. As the Adjacencies failed to generate sales, however, Defendants concealed their poor performance by turning to two unsustainable quick-fixes to prop up their appearance of success—promotions and collaborations.

12. As background, promotions included various sales, discounts, and special offers purportedly designed to entice Bath & Body Works's customers to make repeat purchases and draw new potential customers in. For example, Bath & Body Works held a "semi-annual sale" that targeted its loyalty program members by offering special perks, rewards, and discounts. Specifically, promotions carry risk because, if a company overly relies on them to drive sales, they lead customers to believe that products' discounted price point is their true value. In short, if you can, more often than not, buy a product for half off its retail price, you are less likely to ever pay full price for the same product moving forward.

13. Collaborations encompassed Bath & Body Works's partnerships with other brands for discrete product collections that capitalized on certain popular culture or trends. For example, the Company launched collaborations that incorporate certain movie characters or television shows into Bath & Body Works's home care and body care products. While collaborations can drive sales in certain cases, they can also fail spectacularly because they often rely on fleeting cultural trends and the appeal of other brands. Accordingly, investors understood that promotions and collaborations were not a reliable or sustainable source of sales or growth and, if overused, could damage Bath & Body Works's ability to sell products and brand health.

### C. Defendants Publicly Touted the Success of Bath & Body Works's New Product Lines, While Concealing Their Widespread Failure

14. The Class Period begins on February 29, 2024. By that time, Defendants knew that Bath & Body Works's new product line "Adjacencies" were performing far below internal expectations. Despite this, on that day, Defendant Rosen knowingly and falsely touted to investors that the Adjacencies were successfully driving growth because they had "***attracted new customers to the brand***." Defendants' statements had their intended effect, leading investors to falsely believe that Bath & Body Works's New Product Lines were expanding the brand to new and different customers.

15. Defendants' public statements, however, were false in light of what Defendants actually knew within the Company. As Defendant Heaf would later admit, Adjacencies were never successful in "attracting new customers to the brand." In fact, Defendant Heaf revealed at the end of the Class Period that the opposite was true, unequivocally stating:

> [W]e pursued adjacencies to attract new consumers. But that strategy **has not delivered the growth we expected, and it reduced focus in investing in our core categories** . . . . While all these efforts appealed to our existing consumers, **they did not grow our customer base** and we have not attracted a younger consumer.

16. Critically, Defendant Heaf's admissions about what was happening and known during the Class Period were corroborated by the accounts of FEs, who detailed the Company's unsuccessful expansion into the Adjacencies. Taken together with Defendant Heaf's admissions, these FE accounts demonstrate that the Adjacencies never got off the ground, that the Company was saddled with a surplus of unsold inventory from these failed New Product Lines, and that senior leadership knew during the Class Period (because they received internal reports reflecting their subpar performance at the time) that Defendants were making false statements to the market.

17. For example, FE-3—a former Senior Central Planner—advised that, under the Company's former CEO, Gina Boswell, Bath & Body Works had developed a "very aggressive expansion plan" to add to the Company's bottom line and that the four adjacency product lines of men's grooming, lips, hair, and laundry were part of that plan. According to FE-3, however, the lip, hair, and laundry adjacencies never "got off the ground," and none of them were large enough to "move the needle" to improve the bottom line. The Company's focus on Adjacencies also weakened Bath & Body Work's core products. Indeed, according to FE-2—a former senior leader in product development—Bath & Body Works's core weakened once there was a focus on smaller categories and more emphasis on adjacencies.

18. Additionally, according to FE-1—a former supervisor who analyzed various product distribution and sales information—by 2024, laundry was clearly performing below projections. FE-1 explained that he observed laundry products building up in distribution centers. FE-1 explained that there was a surplus of laundry inventory building up in distribution centers because it was not being deployed to stores because it was not selling.

19. Certain FE accounts also demonstrate that Bath & Body Works executives were aware of these issues at the time, by way of the Company's robust internal sales tracking. For

example, FE-2 confirmed that there were daily flash reports that were circulated at the corporate level that were broken down by locations, SKUs, product lines, etc. Likewise, FE-1 recalled having business overview meetings with senior Bath & Body Works executives where it was discussed that laundry was not performing as well as initial projections. According to FE-1, “it wasn’t a secret that laundry wasn’t performing well.”

20. Former employees also expressed contemporaneous surprise at the public projections released by Defendants, which reported higher figures that did not align with reports they viewed internally.

21. Specifically, FE-3 explained that he was “shocked” at what he saw and heard from the Company’s management in its public statements compared to the information he viewed from Central Planning and Finance. He explained that the numbers for sales projections and margin projections quoted in those earnings calls did not match the numbers he was seeing in his monthly meetings. FE-3 described the numbers quoted by management regarding sales and margin projections in the earnings calls as portraying “a more positive outlook” than the internal figures he and his colleagues had seen.

22. Additionally, according to FE-1, while it was well known throughout the Company that laundry was not performing well, he recalled management making comments about how great laundry was and how well it was selling. FE-1 added that the positive comments about laundry’s performance were made both internally and on earnings calls. FE-1 recalled encouraging statements being made about how customers loved the product, but according to FE-1, the sales data did not support those statements.

23. Notwithstanding this internal information, again, on December 4, 2024, Defendants doubled down on their statements about the Adjacencies by misleadingly assuring investors that

the New Product Lines were not only "***basket builders, but they also bring in new customers***," which conveyed that the Adjacencies were expanding repeat purchasers and attracting new business. Defendants also represented that their performance was consistent with Defendants' past promises, stating "***the adjacencies are delivering as we expected and there's a strong delivery there***."

24. Defendants' statements knowingly concealed from investors that the Adjacencies were not attracting any new customers and were not "building baskets." Throughout the Class Period, Defendants continued to falsely assure investors that the Adjacencies were attracting new customers and driving growth when they simply were not.

### D. Defendants Concealed Flailing Sales Performance Through an Undisclosed, Increasing Reliance on Unsustainable Collaborations and Promotions

25. Faced with the failure of the Company's highly touted New Product Lines and stagnating sales across the business during the Class Period, Defendants increased the Company's reliance on promotions and collaborations to make up for the hole left by the poor sales of the Adjacencies and to meet prior market expectations.

26. For example, on February 29, 2024, Defendant Boratto assured investors—in response to a targeted analyst question about whether the Company's improved performance was "driven by promotions"—by standing firm and stating "[***n***]***o . . .*** [***t***]***hat was not my message***." In doing so, she falsely assured investors that, despite promotions being "part of our strategy," they were not driving Bath & Body Works's financial performance.

27. As the Class Period continued, Defendants concealed from investors the Company's increasing reliance on promotions and collaborations to compensate for its failing new product line sales and using those risky tactics to make quarterly numbers. For example, on June 4, 2024, Defendant Boswell assured investors that "***we were no more promotional than we were***

***last year***" and that Bath & Body Works's collaborations were in fact "***growing the core***" business. In reality, this was materially false.

28. While investors thought that Bath & Body Works's sales numbers reported by Defendants over the Class Period were driven by the success of the Company's New Product Lines—with limited reliance on periodic promotions and collaborations—this was not the case. As Defendant Heaf stunningly admitted at the end of the Class Period, on November 20, 2025, the Company had "**relied on deeper and more frequent promotions**" over the past several years and Bath & Body Works's collaborations were merely a mechanism to "**carry quarters**," rather than build brand equity. Indeed, Defendant Heaf revealed to investors that the Company had become so dependent on these tactics to compensate for flailing sales that a collaboration's success "**was the difference between**" Bath & Body Works meeting or missing guidance.

29. On December 3, 2025, Defendants Boratto and Heaf again confirmed that the Company had increased the frequency of promotions to cover up flailing sales of the Adjacencies by admitting "**we have been incrementally promotional**" and that "**what [Bath & Body Works] doesn't have is durable growth levers**."

### E. The Truth Began to Emerge as Defendants Disclosed Reduced Sales and Margins, Resulting in Declines to Bath & Body Works's Stock Price

30. By the start of 2025, Bath & Body Works's new product Adjacencies continued to fail to generate sales, and the Company's increased reliance on promotions and collaborations to fill the gap left by their lagging performance reached a fever pitch. In the months that followed, the jig was up as Defendants' unsustainable scheme to prop up sales and conceal the Adjacencies' failure caught up with them as they slowly revealed the truth and the extent of their fraud.

31. First, on February 27, 2025, Defendants disclosed that Bath & Body Works's margin had "compressed" or reduced.[5] As a result of this, the Company lowered its reported earnings per share ("EPS") outlook.[6] On this news, Bath & Body Works's stock price declined **by over 12%**, a reduction of $5.22 per share, bringing its share price down to $35.86 on February 27, 2025.

32. These revelations, however, were just the tip of the iceberg. As analysts and investors believed Defendants' continuing assurance of the Company's positive outlook, a wave of senior leadership departures led to increasing disclosures of decreasing financial performance and the reasons behind it.

### F. As Bath & Body Works's Performance Continued to Slide, Defendant Boswell Abruptly Stepped Down as CEO

33. Just three months after Defendants began to reveal Bath & Body Works's slipping performance, on May 19, 2025, Defendant Boswell resigned as CEO and was replaced by Defendant Heaf. Given Defendant Boswell's integral role in spearheading the New Product Lines and misleadingly touting their purported success as long-term and durable drivers of growth, the timing of her departure was highly suspicious.

34. Analysts remarked on her unexpected departure by noting her relatively short tenure and the risk that accompanies a leadership change of such magnitude. For example, analysts with Telsey Advisory Group commented on May 20, 2025, that "Boswell has helmed the company

---

[5] "Margin" measures the amount of a company's revenue that is collected as profit. For example, if a company collects, on average, half of the selling price of its products as profit (after accounting for costs), that company has a margin of 50%. Reduced or "compressed" margin means the company's sales are making less profit. Notably, this occurs when a company is regularly selling its products for a lower price.

[6] EPS measures the Company's profit per share of stock issued.

since 2022 . . . leadership transitions always present an element of risk, and the abruptness of yesterday's announcement was somewhat surprising."

35. Indeed, following Defendant Boswell's departure, a more fulsome picture emerged about the reality of Bath & Body Works's New Product Lines' poor performance and the Company's undisclosed reliance on promotions and collaborations to drive quarters. Specifically, on August 28, 2025, Defendants announced even worse financial results, revealing that Bath & Body Works's sales, margins, and EPS all came in below consensus. On this news, Bath & Body Works's stock price declined **by over 6%**, a reduction of $2.18 per share, bringing its share price down to $29.36 on August 28, 2025.

36. However, as Defendants continued to reassure investors that the Company's adjacency and core business remained strong, the market remained in the dark regarding the full extent to which Bath & Body Works had grown dependent on promotions and collaborations to drive sales, as well as the stunning failure of the Adjacencies.

### G. On November 20, 2025, Defendants Shocked Investors by Admitting to the Adjacencies' Failure and Reliance on Short-Term Fixes to Drive Sales

37. On November 20, 2025, the full extent of Defendants' fraud was revealed when the Company released its earnings results for 3Q 2025. Defendants disclosed that Bath & Body Works's EBITDA, sales, and gross margin were all well below the market's expectations.[7] Worse, Defendant Heaf explicitly attributed the declines to past failures of the Company's New Product Lines and its overreliance on promotions and collaborations to compensate for flailing sales.

38. Moreover, as part of this admission, Defendants revealed that the failure of the Adjacencies and reliance on short-term gimmicks had, in turn, weakened Bath & Body Works's

---

[7] EBITDA is earnings before interest, tax, depreciation, and amortization.

ability to sell its core products, which further contradicted what Defendants had told investors throughout the Class Period.

39. On this news, the price of Bath & Body Works stock plummeted, tumbling $5.22 per share, or **over 24%,** to close at $15.82 on November 20, 2025. The Company's closing share price on this date amounted to a staggering **69.5% decline** from its Class Period high on May 31, 2024, when it closed at $51.94 per share.

40. Specifically, Heaf, as the Company's new CEO, revealed what Defendants had known throughout the Class Period by admitting to investors that, contrary to what the Company told the market in the past, there were specific reasons for Bath & Body Works's increasingly poor performance (all of which the Company lied about throughout the Class Period):

> Firstly, we pursued adjacencies to attract new consumers. **But that strategy has not delivered the growth we expected, and it reduced focus in investing in our core categories**. Secondly, **collaborations that should have been used to drive excitement, energy, and equity into our brand has been used to carry quarters**. Thirdly, as these strategies and other tactics have not delivered growth, **we have relied on deeper and more frequent promotions**. Great value and exciting deals have been part of our brand, and that will not change. However, **overreliance on promotion delivers diminishing returns and erodes brand equity, and that is what has happened here**. While all these efforts appealed to our existing consumers, **they did not grow our customer base** and we have not attracted a younger consumer. Finally, our organization has become slow and inefficient.

41. Defendants' disclosure on November 20, 2025 revealed to the market that the Adjacencies had failed to attract new customers or drive growth, and that the consistent sales growth that Bath & Body Works had reported during the Class Period had been unsustainably fueled by promotions and collaborations.

42. Analysts expressed shock at the disclosures. For example, analysts with Goldman Sachs stated that the market was "surprised with the de-emphasis of adjacent categories, **given management's previous comments on adjacent category growth outperformance**[.]"

43. Defendant Heaf's admissions made clear that Defendants' statements throughout the Class Period were contemporaneously false. As shown in the chart below, his admissions stand in direct contradiction to Defendants' Class Period misstatements to investors.

| Topic | Defendants' Class Period False Statements | Defendants' End-of and Post-Class Period Admissions |
|---|---|---|
| **Adjacencies** | As Gina mentioned, we have finished the rollout of fragrant hair care to all stores this spring. ***And this is another line that we have learned that is attracting new customers to Bath & Body Works***.<br><br>So, these adjacent categories, the role of which is really to expand and diversify our portfolio in the stores and bring our fragrance expertise to life through new and different forms, right? ***And so, ultimately, they're basket builders, but they also bring in new customers and so forth***.<br><br>***Actually, the adjacencies are delivering as we expected and there's a strong delivery there***. Nothing's changed from that perspective . . . . | [W]e pursued adjacencies to attract new consumers. But that strategy **has not delivered the growth we expected, and it reduced focus in investing in our core categories**. . . While all these efforts appealed to our existing consumers, **they did not grow our customer base** and we have not attracted a younger consumer.<br><br>So laundry, lip, hair, men's as good examples of those adjacencies that was done with the intention of driving both top line growth and acquiring new customers and **that strategy was not successful**. **It didn't achieve the growth that we expected**. And perhaps most important, **it didn't bring new consumers to the brand**. |
| **Promotions** | We do rigorous testing on these promotions, which impact AUR [Average Unit Retail], and ***we are ensuring that they're accretive to both sales and margin dollars***.<br><br>So other than the first part of Q1, ***we were no more promotional than we were last year***, and we're back on plan to our AUR flat expectations. | [A]s these strategies and other tactics have not delivered growth, **we have relied on deeper and more frequent promotions**.<br><br>**[O]ver the past several years, we have leaned into more frequent and deeper promotions to prop up the top line**. |
| **Collaborations** | And we speak about ***growing the core, which these partnerships and*** | [C]ollaborations that should have been used to drive excitement, energy, and |

| Topic | Defendants' Class Period False Statements | Defendants' End-of and Post-Class Period Admissions |
|---|---|---|
| | ***collaborations do just that*** and then the more on the adjacencies is also critical. | equity into our brand has been **used to carry quarters**.<br><br>This business is not broken. **But what it doesn't have is durable growth levers**. |

44. Following Defendants' final corrective disclosure on November 20, 2025, the market finally understood the truth: (i) Bath & Body Works's New Product Lines of "Adjacencies" neither attracted new customers nor drove sales; (ii) the Company had been increasingly promotional and had relied on collaborations to hit sales targets; and (iii) Bath & Body Works's sale of core products had weakened as a result of Defendants' concealment.

45. As a result of Defendants' wrongful acts and omissions, as well as the decline in the market value of the Company's securities, Lead Plaintiff and members of the Class have suffered significant losses and damages. This Action seeks to recover those losses caused by Defendants' fraud.

## II. JURISDICTION AND VENUE

46. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).

47. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

48. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), Section 27 of the Exchange Act (15 U.S.C. §78aa), and S.D. Ohio Civ. R. 82.1 because Bath & Body Works is headquartered in this District, the Company conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

49. In connection with the acts, conduct, and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

50. Lead Plaintiff West Virginia IMB was created by action of the Legislature under the West Virginia Investment Management Board Act [West Virginia Code §12-6-1 et seq.]. As of June 30, 2025, West Virginia IMB managed approximately $28.5 billion in assets for the State's defined benefit retirement plans as well as State and local government funds. West Virginia IMB is dedicated to the interests of the State's teachers, public employees and workers, other State funds, and the fiscal health of the State and operates as an independent board with its own financial professionals. As set forth in its certification (filed herewith as Exhibit A), West Virginia IMB purchased Bath & Body Works common stock on the New York Stock Exchange ("NYSE") during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

#### 1. Corporate Defendant

51. Defendant Bath and Body Works, Inc. ("Bath & Body Works") is incorporated under the laws of Delaware, with its principal executive offices located in Columbus, Ohio. During the Class Period, the Company's stock traded on the New York Strock Exchange ("NYSE") under the ticker symbol "BBWI." Bath & Body Works is a global leader in personal care and home fragrance. Bath & Body Works offers body care products available in multiple forms, including fine fragrance mist, body cream, lotion, body wash, hand soap, sanitizer, and candles. Bath &

Body Works sells its products in approximately 1,927 company-operated stores in the U.S. and Canada (and e-commerce sites), 573 international stores, and 34 e-commerce sites in more than 45 other countries.[8]

### 2. Individual Defendants

52. Defendant Boswell was the Company's Chief Executive Officer ("CEO") from December 1, 2022 until May 19, 2025. Prior to joining Bath & Body Works, Boswell held various senior executive roles with Unilever PLC ("Unilever") from 2011 to 2019. Previously, Boswell held senior level management roles at companies including Alberto-Culver Company, Avon North America, Ford Motor Company, and The Estée Lauder Companies Inc. In her role as CEO of Bath & Body Works, Boswell participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact concerning Adjacencies, promotions, collaborations, and sales. In her role as CEO, Boswell also signed certifications pursuant to the Sarbanes-Oxley Act of 2022 ("SOX"), in connection with the Company's annual and quarterly filings on Forms 10-K and 10-Q, which falsely certified that the Company's annual and quarterly reports complied with the requirements of Section 13(a) and 15(d) of the Exchange Act and that "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

53. Defendant Heaf has been Bath & Body Works's CEO since May 19, 2025, after taking over for Boswell. Prior to joining Bath & Body Works, Heaf held various senior-level executive positions at companies including Nike Inc. and Burberry. In his role as CEO of Bath &

[8] Bath & Body Works utilizes the retail calendar for reporting, meaning its fiscal year ends on the Saturday nearest to January 31. As a result, "2025" refers to the 52-week period ended January 31, 2026, and "2024" refers to the 52-week period ended February 1, 2025. Bath & Body Works's fiscal quarters are referred to herein as "1Q," "2Q," "3Q," and "4Q."

Body Works, Heaf participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact concerning Adjacencies, promotions, collaborations, and sales.

54. Defendant Boratto was Bath & Body Works's Chief Financial Officer ("CFO") from August 2023 until the announcement of her resignation on May 27, 2026, which became effective June 12, 2026. In her role as CFO, Boratto oversaw the global finance organization and real estate group. Prior to joining Bath & Body Works, Boratto was the CFO of Opentrons Labworks, Inc., a privately held life sciences company and a senior-level executive for CVS Health Corporation and Merck & Co. In her role as CFO of Bath & Body Works, Boratto participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact concerning Adjacencies, promotions, collaborations, and sales. In her role as CFO, Boratto also signed certifications pursuant to the Sarbanes-Oxley Act of 2022 ("SOX"), in connection with the Company's annual and quarterly filings on Forms 10-K and 10-Q, which falsely certified that the Company's annual and quarterly reports complied with the requirements of Section 13(a) and 15(d) of the Exchange Act and that "[t]he information contained in the [reports] fairly presents, in all material respects, the financial condition and results of operations of the Company."

55. Defendant Rosen was Bath & Body Works's President of Retail from September 2020 until September 25, 2024. In her role, Rosen oversaw stores, international, product functions, including merchandising, design, planning and allocation, and store design. Rosen has a deep merchant background and a wide breadth of leadership experience. Prior to joining Bath & Body Works, Rosen served as a senior-level executive with Ann Inc., part of Ascena Retail Group, and Banana Republic. In her role as President, Retail at Bath & Body Works, Rosen participated in

earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact concerning Adjacencies, promotions, collaborations, and sales.

56. Defendants Boswell, Heaf, Boratto, and Rosen are collectively referred to herein as the "Individual Defendants." The Company and the Individual Defendants are collectively, in whole or in part, referred to herein as the "Defendants."

57. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control Bath & Body Works's operations, the contents of reports to the SEC, press releases, presentations to securities analysts, money and portfolio managers, and institutional investors (*i.e.*, the market), and public statements. The Individual Defendants received copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected or rendered complete, accurate, and non-misleading.

58. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations were materially false and/or misleading when made. The Individual Defendants are liable for the false statements pleaded herein, and their scienter is imputed to Bath & Body Works.

### C. Relevant Third Parties[9]

59. FE-1 was employed with Bath & Body Works from several years prior to the Class Period through mid-2025 in various operational and sales planning roles. Most recently, FE-1 worked in a supervisory role that tracked the flow of Bath & Body Works's products, during which

---

[9] FEs are identified herein by number (FE-1, FE-2, etc.). All FEs are described in the masculine to protect their identities.

he analyzed various product distribution and sales information. FE-1 explained that during his time with the Company, he worked very closely with collaborations and laundry.

60. FE-2 was employed with Bath & Body Works as a senior leader in product development for over ten years prior to the start of and into the Class Period, through early 2024. He explained that his role was part of the innovation team that reported to the Company's Chief Supply Chain Officer who, in turn, reported to the CEO.

61. FE-3 was employed with Bath & Body Works as a Senior Central Planner from June 2022 through February 2024. He described his role in Central Planning as a link between Merchandise Planning, which analyzes how products are expected to perform in terms of sales and margin, organized by department, and Finance. He added that Merchandise Planners prepare sales plans at the department level which are communicated to Central Planners, who in turn work with Finance to review plans and allocate resources.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Bath & Body Works's Business

62. Bath & Body Works is a fragrance-focused company that sells body care and home care products. Some of the Company's most popular fragrance-focused products include scented candles, sprays, soaps, sanitizers, and lotions. Bath & Body Works is both a brand and a retailer.

63. Prior to 2021, Bath & Body Works was part of L Brands, Inc. ("L Brands"), a retail conglomerate founded and run by Les Wexner. In addition to Bath & Body Works, L Brands previously owned other brands such as Victoria's Secret, Pink, and Express. In 2021, L Brands spun off Victoria's Secret (its only other brand at the time besides Bath & Body Works) and rebranded the remaining corporation as Bath & Body Works.

64. Since its inception, Bath & Body Works has developed, marketed, and sold several popular and seasonal scents through its various products. Historically, Bath & Body Works has

sold limited categories of product lines and relies heavily on a recurring consumer base that repeatedly buys its key or "core" product offerings.

### 1. Bath & Body Works's "Core" Product Lines Drove Steady Growth and Investor Returns

65. For most of its history, Bath & Body Works remained focused on selling its "core" products, consisting of certain best-sellers such as candles, fragrance sprays, and hand soaps. These products have long been the principal driver of Bath & Body Works's sales growth, as well as the products that customers most associate with Bath & Body Works's brand.

66. Accordingly, investors, analysts, and Defendants all paid close attention to the success of the core products driving the Company's ostensible sales and growth, viewing them as a proxy for overall brand health. For example, on August 28, 2024, analysts from TD Cowen described "**[b]rand health and consumer traction in the core categories**, such as body care and candles," as a key factor to monitor, citing the importance of "general consumer sentiment, **customer response to newness** [i.e., Adjacencies], and **core product performance**."

### 2. Bath & Body Works's Business Model Involves Periodic Promotions and Collaborations that Carry Inherent Risk If Over Relied On

67. Bath & Body Works is also known for its promotions and, more recently, product collaborations. Both promotions and collaborations ostensibly serve to stimulate sales and keep customers engaged. These tactics carry inherent risk, however, such as consumers devaluing a brand or refusing to pay retail price for items that they perceive as lower in value. Accordingly, the degree to which a company relies on these tactics to generate sales matters to investors because they impact the long-term viability of the brand and sustainability of sales.

68. Specifically, promotions involve lowering the price of certain items or offering additional items with the purchase of a product (such as "buy one get one free" sales). Certain,

limited promotions have long been a part of Bath & Body Works's business model. These include the Company's twice yearly "semi-annual sale" and annual "candle day" promotion.

69. Collaborations are another strategy that Bath & Body Works used to drive sales. For a collaboration, Bath & Body Works partners with another brand, typically a media franchise, to sell specific themed products.

70. Collaborations are limited—they last a set amount of time, and Bath & Body Works typically runs one collaboration at a time. Notably, collaborations are risky because they partially rely on the popularity of—and essentially ride the coattails of—an outside brand or a trend rather than Bath & Body Works's independent brand appeal to potential customers.

71. An interview with a former Bath & Body Works Vice President conducted by Wells Fargo Equity Research and published on the AlphaSense financial research platform on August 27, 2024, illustrates how collaborations can operate more as detours or quick-fixes that can have negative impacts on a company's brand image, rather than brand-building endeavors. The interview quoted Steven Lange, a former Vice President with the Company for over fifteen years, who explained that collaborations "are similar to what you see with grocery CPG [consumer packaged goods] companies, partnering with movies/shows on a food product, but not actually driving a deeper conversation – and that the focus should be around the quality of the product and creating lasting demand."

**B. Leading Up to the Class Period, Defendant Boswell Took Over as Bath & Body Works's CEO and Directed Expansion into New Product "Adjacencies"**

72. From 2020 through 2022, Bath & Body Works experienced a period of record sales and sales growth under then-CEO Andrew Meslow. However, Meslow resigned in 2022 citing health concerns, and the Company was forced to look for a new CEO.

73. In December 2022, Defendant Boswell became Bath & Body Works's new CEO and promptly set about drastically remaking the Company to sustain and expand Bath & Body Works's strong sales growth of the past several years. Defendant Boratto, who was appointed CFO soon thereafter on August 1, 2023, also drove this endeavor, along with Defendant Rosen, who had previously run Bath & Body Works's retail sales since 2020.

74. The centerpiece of Defendants' plan to sustain and expand sales growth was the development of "Adjacencies," or New Product Lines that Bath & Body Works had not historically sold. Starting in 2023, the Company began a full-scale rollout of four Adjacencies as additional product lines. These products sought to capitalize on Bath & Body Works's proprietary scents, while expanding the brand's reach to new customer demographics.

75. These New Product Lines or "Adjacencies" were: (i) laundry care, which included clothing detergents, and scent beads; (ii) lip care, which included lip balms and lip glosses; (iii) hair care, which included shampoos and conditioners; and (iv) men's grooming products, which included beard care, hair styling, and skin care products.

76. Leading up to the Class Period, Defendants assured investors that Bath & Body Works's new Adjacencies would boost sales by attracting new customers that had not historically shopped at Bath & Body Works. For instance, Defendant Rosen claimed on August 23, 2023 during a Company earnings call that Bath & Body Works "**[knew] from the data**" that the Adjacencies were bringing in new customers that had not previously shopped at Bath & Body Works. Rosen later added on a November 16, 2023 Company earnings call, in response to detailed analyst questioning, that "**the great thing about the new categories is they definitely bring new customers**."

### C. From the Start of the Class Period, Defendants Misled Investors About the Success of Bath & Body Works's New Product Lines

77. At the end of the Class Period, on November 20, 2025, and through subsequent detail provided on December 3, 2025, Defendant Heaf shocked investors by openly admitting that Bath & Body Works's Adjacencies "**didn't bring new consumers to the brand**," "**did not grow [the Company's] customer base**," and were "**not successful**" in "**driving [] top line growth**." For the twenty-one months preceding those disclosures, however, Defendants continuously and falsely told investors the opposite: that Adjacencies had brought new customers to the brand, were growing the Company's customer base, and were driving top line growth. In doing so, Defendants actively concealed from investors that Bath & Body Works's New Product Lines were abject failures. Indeed, these new Adjacencies were not driving financial growth, attracting new customers to the brand, or expanding the basket sizes of its customers.

78. For example, on February 29, 2024—the first day of the Class Period—Bath & Body Works announced its 4Q 2023 earnings results. On the associated earnings call that same day, Defendant Rosen claimed that Bath & Body Works's Adjacencies were bringing in new customers when she stated: "***lip products have attracted new, younger customers to our brand and represent an opportunity to expand our customer base***." On the same call, she also falsely represented that hair care was "another line that ***we have learned that is attracting new customers***" to Bath & Body Works and that, "[***l***]***ike our other new categories, laundry has attracted new customers to the brand***."

79. Rounding out her misleading statements regarding the New Product Lines, later in the call, Rosen added "[***w***]***e know that Men's is attracting a younger customer and a slightly more diverse customer***[.]" Similarly, just a few weeks later, on March 12, 2024, Defendant Boratto

told investors that Bath & Body Works's "four key adjacencies," namely "Men's, lip, hair and laundry, . . . ***enable us to attract new customers***[.]"

80. As a result of Defendants' misstatements, investors believed that Bath & Body Works had achieved growth, driven by these Adjacencies, which made the Company more valuable and would allow it to sustain and augment sales growth.

81. For example, on March 5, 2024, shortly after the Class Period started, analysts from Morningstar Equity explained they saw significant upside in the stock because Bath & Body Works "has outlined **a compelling pipeline of opportunities across existing and adjacent categories to reach new consumers and stimulate higher sales conversion** ahead."

82. However, in stark contrast to the market's understanding, as Defendant Heaf eventually admitted at the end of the Class Period, Defendants' statements were false because the New Product Lines had not attracted new customers to the brand and were, in fact, a failure.

83. Worse, Defendants concealed the true cause of Bath & Body Works's sales growth when Defendants falsely attributed its financial growth to strong core sales and successful rollout of Adjacencies. In truth, as detailed in Section IV.E, *infra*, Defendants concealed that the true reason for the positive financial results were the Company's increased reliance on promotions and collaborations—both short-term initiatives that were inherently unsustainable—to compensate for the dearth of sales left by the failure of the Company's New Product Lines.

84. Behind the scenes and unbeknownst to investors, however, Defendants knew that the Adjacencies were an abject failure. Rather than come clean, throughout the Class Period, Defendants concealed their failure to buoy the Company's stock price.

### D. Former Employees' Accounts Support that Defendants Concealed the Failure of Bath & Body Works's Adjacencies Throughout the Class Period

85. While investors remained in the dark as to the truth of the performance of Bath & Body Works's New Product Lines, former employees or FEs, all of whom were well-situated within the Company, provide contemporaneous accounts of the Adjacencies' failure. Critically, these FE accounts align with Defendant Heaf's shocking admissions at and after the end of the Class Period revealing that the Adjacencies utterly failed to attract new customers or expand Bath & Body Works's customer base.

86. Specifically, at the end of the Class Period, on November 20, 2025, Defendant Heaf openly admitted to investors (in direct contradiction to Defendants' Class Period misstatements touting their success) that Bath & Body Works's Adjacencies "**did not grow our customer base**." Nearly a month later, on December 3, 2025, at an investor conference, Defendant Heaf was even more explicit, admitting "perhaps most important, [Adjacencies] **didn't bring new consumers to the brand.**"

87. In fact, throughout the Class Period, the Adjacencies performed well below the Company's expectations, and certain Adjacencies, such as laundry, were an unmitigated disaster. Indeed, the accounts of these well-situated FEs support that Bath & Body Works's Adjacencies were not driving sales—corroborating Defendant Heaf's admissions at the end of the Class Period.

#### 1. Before and Into the Class Period, Defendant Boswell Forced the Launch of New Product Lines that Failed and Weakened Core Sales

88. FE accounts support that the launch of Bath & Body Works's New Product Lines was part of an aggressive expansion plan by former CEO Boswell that—as Defendant Heaf later admitted—failed to get off the ground or drive sales.

89. FE-3—a former Senior Central Planner— advised that, under the Company's former CEO, Gina Boswell, Bath & Body Works had developed a "very aggressive expansion

plan" to add to the Company's bottom line and that the four adjacency product lines of men's grooming, lips, hair, and laundry were part of that plan. He explained that he was told about these initiatives in quarterly or seasonal meetings in which Boswell presented the initiatives, and that those meetings were recorded to be viewed at multiple Bath & Body Works offices.

90. According to FE-3, however, the lip, hair, and laundry adjacencies never "got off the ground," and none of them were large enough to "move the needle" to improve the bottom line. FE-3 added that Bath & Body Works did not get the traction in these areas that it needed for its aggressive expansion plan. FE-3 explained that these product lines were not big enough to meet the Company's goals.

91. Defendant Boswell's directive to drive these new Adjacencies had an additional cost: the increased investment in Adjacencies cannibalized resources and investment into Bath & Body Works's core products. Ultimately, this caused the Company's core—its historically stable sales engine—to weaken throughout the Class Period.

92. Indeed, Defendant Heaf admitted at the end of the Class Period, on November 20, 2025, that the Company's investment into the failing Adjacencies "**reduced focus in investing in our core categories**." As Defendant Heaf described in greater detail on December 3, 2025, the Company "made choices in the prior years to invest our marketing money, invest our research and development money . . . in those adjacencies. And **as a result, we pulled time, money and attention away from our core**."

93. Stunningly, on November 20, 2025, Defendant Heaf also conceded that the Company had concealed its underperforming core when he admitted, "it's clear to me that the core is weaker, and some of **that was masked** by promotions and collabs and anniversarying some of those adjacent product launches."

94. The real-time accounts of FEs corroborate Defendants' own admissions by providing detail regarding Bath & Body Works's weakening sales as a result of Defendants' ongoing pursuit of the Adjacencies despite their failure.

95. For example, FE-2—a former senior leader in product development—added that when new leadership came in, CEO Gina Boswell brought in multiple consultants to "do a deep dive." FE-2 explained that Bath & Body Works brought in multiple external consultants, including McKinsey and Accenture, in late 2022 and early 2023. FE-2 explained that, at this time, he could see that the business was slipping a bit. FE-2 added that it was around this time that dupes and collaborations began at Bath & Body Works.[10]

96. According to FE-2, Bath & Body Works's core weakened once there was a focus on smaller categories and more emphasis on adjacencies. FE-2 also explained that those adjacencies were "not even remotely to scale with core" and "should have been meant to support." He detailed that newer launches of smaller form product lines like lip, hair, and men's, required more education, testing, and information. FE-2 further explained that launches of these new product lines required sales associates to be highly educated and trained in order to sell the products. According to FE-2, selling those products is more complicated than selling Bath & Body Works's core form products.

---

[10] "Dupes" commonly refer to "duplicates" or copies of popular products from other brands. Typically, dupes are affordable alternatives to higher-end products that mimic the style, function, or ingredients of the original product at a fraction of the cost.

### 2. When the Class Period Began in 2024, Bath & Body Works's New Product Lines Were Already Failing

97. By the start of the Class Period, Bath & Body Works's New Product Lines were already failing. FE accounts detail, for example, that by 2024, it was widely known within the Company that the laundry line was not performing well.

98. FE-1—a former supervisor who analyzed various product distribution and sales information—explained that he was extremely familiar with Bath & Body Works's laundry line and was involved with that adjacency from before it launched through processing the product to consumers. According to FE-1, by 2024, laundry was clearly performing below projections.

99. FE-1 recalled having business overview meetings with senior Bath & Body Works executives where it was discussed that laundry was not performing as well as initial projections. According to FE-1, "it wasn't a secret that laundry wasn't performing well."

100. Specifically, FE-1 recalled receiving communications from senior leaders, including a Senior Operations Manager at Bath & Body Works about the poor performance of the laundry line. FE-1 detailed that, in addition to email communications about laundry, there were also verbal communications about the poor performance of laundry from Bath & Body Works executives like the Company's Director of Operations.

101. FE accounts also support that the Company's close monitoring of its product movement and sales made it clear that the New Product Lines were failing, as illustrated by a surplus of unsold new product inventory building up from the Laundry and Lip Care lines.

102. FE-1 explained that he had visibility into the entirety of laundry sales and laundry product movements across the entirety of Bath & Body Works's sales network. FE-1 explained that he could see how inventory was flowing to the retail stores.

103. Additionally, FE-1 described that he had visibility into which categories were selling based on units sold. FE-1 relayed that the information was readily available to him and there were live updates on the data throughout the day. FE-1 recounted how he pulled the data from a warehouse tracking system called PKMS (Personal Knowledge Management System). FE-1 added that the data was housed on PKMS and pulled through Microsoft Access.

104. FE-1 explained that he observed laundry products building up in distribution centers. According to FE-1, inventory deployment analysts pushed inventory to the stores based on sales data. FE-1 explained that there was a surplus of laundry inventory building up in distribution centers because it was not being deployed to stores because it was not selling. According to FE-1, laundry stock in the warehouse would "sit there for months."

105. FE-1 also recalled lip care being a slower moving item. FE-1 recalled that lip care was placed in the training zone in the warehouse because of how few units were moving. According to FE-1, they used the product to train employees because they knew it did not move as fast as other products.

### 3. Defendants' Rigorous Internal Tracking of Sales and Inventory Made the Failure of Its New Products Readily Apparent

106. Additional FE accounts detail how Bath & Body Works's role as both the brand and the retailer gave senior management real-time visibility into the success (or failure) of its products on a daily basis. These FE accounts detail, for example, daily sales reports, weekly C-suite meetings, and the C-suite's visit to the Company's e-commerce warehouse, where a surplus of unsold laundry and lip products sat unsold, in late 2024—a time when the Adjacencies' failure was widely discussed and known internally.

107. FE-2 explained that a benefit of Bath & Body Works being both the brand and the retailer was that it was able to see what was happening on a daily basis by spending time at the

stores, asking questions, and talking with customers. FE-2 confirmed that there were daily flash reports that were circulated at the corporate level that were broken down by locations, SKUs, product lines, etc.

108. FE-2 described that Bath & Body Works was "built on a rigorous meeting cadence." FE-2 attended weekly meetings with Bath & Body Works's Chief Supply Chain Officer every Thursday, who met at least once a week with CEO Boswell. According to FE-2, the C-Suite also met weekly every Wednesday. FE-2 added that he recalled a Monday night meeting where sales from the weekend were discussed. According to FE-2, there was a chain of communications every day.

109. Additionally, FE-1 explained that the department that he oversaw was the "brains of the e-commerce building" in Ohio. According to FE-1, the e-commerce building was known internally as "DC-9" or "Warehouse 21," which was responsible for shipments all over the U.S. He added that his department was responsible for the planning, execution, and research and resolve for all orders coming out of DC-9.

110. FE-1 recalled members of the C-Suite visiting Warehouse 21 for a meeting in August or September 2024. While he was not directly involved in that meeting, however, he knows that laundry products were discussed, including the performance of that product line, packaging, shipping and customer complaints.

111. According to FE-1, everyone in the warehouse knew about this C-Suite visit because they had to prepare the building for them. FE-1 also explained that what was going to be discussed at the meeting was a topic of conversation around the warehouse. FE-1 recalled being able to see the slides that they had up for the meeting from the warehouse floor. FE-1 added that these slides referenced adjacencies such as laundry, hair, and lip.

### 4. Defendants Reported Numbers on Earnings Calls that Were Higher Than Internal Reports Reviewed by Former Employees

112. Given the Company's rigorous tracking of its product sales, FEs recall shock when listening to Company earnings calls during their employment, as the Company's reported financial performance did not align with internal reports.

113. FE-3 recalled that he and his colleagues were put in rooms together to listen to Bath & Body Works's earnings conference calls. FE-3 further explained that the practice of having the Central Planners watch the earnings calls in a room together was a directive from the Assistant Vice President.

114. FE-3 explained that he was "shocked" at what he saw and heard from the Company's management in its public statements compared to the information he viewed from Central Planning and Finance. He explained that the numbers for sales projections and margin projections quoted in those earnings calls did not match the numbers he was seeing in his monthly meetings. He elaborated that the incorrect numbers he observed were for sales projections and margin projections. He added that, according to his colleague who had responsibility for inventory, the inventory numbers were also not accurate.

115. FE-3 added that he recently spoke to other former Central Planners who had also recently left Bath & Body Works, and those colleagues also remembered those meetings and said that they, too, did not know where management was getting its numbers for certain items such as sales projections, margin projections, and inventory.

116. FE-3 described the numbers quoted by management regarding sales and margin projections in the earnings calls as portraying "a more positive outlook" than the internal figures he and his colleagues had seen. FE-3 emphasized that it's "hard to hide stuff" in an $8 billion

company, so he did not know why management was citing incorrect numbers, but he and his colleagues did not know where they were getting those figures.

117. Additionally, according to FE-1, while it was well known throughout the Company that laundry was not performing well, he recalled management making comments about how great laundry was and how well it was selling. FE-1 added that the positive comments about laundry's performance were made both internally and on earnings calls. FE-1 recalled encouraging statements being made about how customers loved the product, but according to FE-1, the sales data did not support those statements.

### E. Defendants Misled the Market About Promotions and Collaborations

118. Faced with failing Adjacencies that were not driving sales, however, Defendants concealed from investors Bath & Body Works's increased reliance on promotions and collaborations to compensate for the gap in sales left by the Companies' failed New Product Lines. While both temporarily boosted sales, Defendants' degree of reliance on these practices was neither fully disclosed nor sustainable. Indeed, Defendants kept investors in the dark that the Company was dependent on the outcomes of these tactics to make its quarterly numbers.

#### 1. Defendants Misleadingly Told Investors that Bath & Body Works Was Not Increasing Its Reliance on Promotions to Drive Sales

119. As described in Section IV.A.2, *supra*, promotions have the ability to drive increased sales, up to a point. However, they can also cut into a brand's ability to sell products at full retail price and damage brand equity. Moreover, promotions can only produce increased sales for a short period of time—their ability to drive sales diminish when overused.[11]

[11] As Defendant Heaf explained on December 3, 2025, this is because over use of promotions "erodes reference price points." So, if a company relies too heavily on promotions to drive sales, customers will start viewing the discounted or "promotional" price as the amount that the product is worth. This, in turn, means that customers will be less likely to purchase that same product at its normal, retail price which, in turn, reduces company profit margins.

120. For example, on January 25, 2024, analysts with Jefferies noted that "[k]ey risks [to valuing Bath & Body Works stock] include: . . . promotions & discounts affecting margins" and assessed their risk scenarios based on the Company's use of promotions, while noting their expectation "that **promotion will continue at current levels**[.]"

121. Throughout the Class Period, Defendants concealed from investors that Bath & Body Works was increasing its reliance on promotions by ramping up its discounts and special offers to drive sales as the Adjacencies failed to produce the growth that Defendants falsely touted. Put simply, Defendants kept investors in the dark regarding the extent to which Defendants were using promotions and collaborations to drive sales as the Adjacencies failed to sell.

122. From the first day of the Class Period, on February 29, 2024, for example, when touting the success of Bath & Body Works's business model, Defendant Rosen stated: "[***w***]***e don't plan for this business to be more promotional over time, so I want to make sure we're all clear on that***." Then, when an analyst asked her to clarify whether Bath & Body Works's performance was currently being driven by promotions, Defendant Boratto emphatically denied it, stating "***No. No, I apologize***. ***That was not my message***."

123. Accordingly, investors remained laser-focused on whether Bath & Body Works's reliance on promotions was driving sales in a quarter because, if Bath & Body Works's sales growth was fueled by higher promotions, those sales increases would not continue in future quarters.

124. Defendants' statements were materially false and misleading. Together, they conveyed to investors that Bath & Body Works's performance was not driven by promotions, but rather was driven by growth in its core and Adjacencies. In reality, and as Defendant Heaf again

admitted after the Class Period ended, Bath & Body Works was "**lean[ing] into more frequent and deeper promotions to prop up the top line**."

125. Throughout the Class Period, Defendants continued to downplay Bath & Body Works's overreliance on promotions. For example, on November 25, 2024, Defendant Boswell claimed that the Company performed "rigorous testing on these promotions," and as a result, was "***ensuring that they're accretive to both sales and margin dollars***."

126. Defendant Boswell's statement, however, was belied by the fact that the Company was increasing its undisclosed reliance on promotions to the detriment of both long-term sales and the perceived value of Bath & Body Works's products. Bolstered by Defendants' ongoing misstatements, analysts repeatedly noted their understanding that Bath & Body Works was not relying on promotions to drive sales. For example, on November 25, 2024, analysts from Bank of America stated, "[**h**]**itting margin guidance indicates that BBWI didn't drive the sales growth with outsized promotional activity** or marketing above plan." Additionally, on February 24, 2025, analysts from Barclays stated that "new product releases," as well as "continued expansion of men's, hair care, laundry, fragrance, and pet **appear to be leading to reduced need for promotional activity**."

127. Accordingly, investors had the rug pulled out from under them when, on November 20, 2025, Defendant Heaf blatantly admitted that Bath & Body Works's performance had "**overreli[ed] on promotions**," particularly "**deeper and more frequent promotions**," which had ultimately "deliver[ed] diminishing returns" and "**masked**" weakness in core sales. Defendant Boratto confirmed this weeks later on December 3, 2025, when she directly contradicted her own Class Period misstatements by admitting "in many quarters, **we have been incrementally promotional**."

### 2. Defendants Concealed from Investors that Bath & Body Works Was Also Relying on Inherently Risky Collaborations to Meet Sales Targets

128. Prior to Defendant Boswell taking over as CEO of Bath & Body Works, the Company did not participate in collaborations.[12] However, during Boswell's tenure as CEO, the Company regularly used collaborations to drive sales and, as Defendant Heaf admitted—in a stunning *mea culpa* on behalf of the Company—on November 20, 2025, it did so to "**carry quarters**."

129. Heaf's November 20, 2025 revelations conceded that collaborations "should have been used to drive excitement, energy, and equity into our brand" rather than "carry quarters." Indeed, throughout the Class Period, that is precisely what analysts believed was happening. For example, on November 25, 2024, analysts with Morgan Stanley described the Company's collaborations as a means of "driving excitement for consumers."

130. As described in Section IV.A.2, *supra*, collaborations (like promotions) can increase sales. However, that possibility is highly contingent, as the outcomes of collaborations tend to be volatile, given that collaborations seek to piggyback on certain trends or the popularity of an external brand and cost a significant amount of money to roll out. For example, if a collaboration is not successful in appealing to Bath & Body Works's customers, it will contribute very little to sales growth while simultaneously costing a lot in packaging, design and promotional materials. Accordingly, failed collaborations can cost a company millions in lost sales and also drive down profit margins.

[12] Kate McShane, et al., *Bath & Body Works Inc. (BBWI): Takeaways from NDR*, at 2 (Goldman Sachs Equity Research, Oct. 14, 2024) ("When Ms. Boswell arrived at BBWI in Dec '22, BBWI was not participating in collaborations").

131. Here, Defendants misled investors during the Class Period because investors were in the dark as to the fact that Bath & Body Works—due to the failure of its New Product Lines to generate the sales that Defendants falsely touted—was relying on the success of collaborations to meet market expectations and previously issued guidance.

132. Put simply, investors were completely unaware that the Company's ability to meet its sales expectations was riding on the success of highly contingent and volatile collaborations. Indeed, as Defendant Heaf admitted, on November 20, 2025, part of the reason for Bath & Body Works's sales collapse at the end of the Class Period was because collaborations were used to "**carry quarters**," rather than to instead "drive excitement."

133. Worse yet, Defendant Heaf admitted that Bath & Body Works was in a position during the Class Period where a collaboration succeeding "**was the difference between**" meeting guidance and missing guidance—a fact that Defendants intentionally kept from investors.

### F. As the Class Period Continued, Defendants Continued to Mislead Investors as to the Extent to Which the Adjacencies, Promotions, and Collaborations Were Driving Bath & Body Works's Success

134. As the Class Period wore on, Defendants continued to mislead investors by attributing the Company's ostensible sales success to the growth of Adjacencies and strong sales in Bath & Body Works's core, while downplaying the extent to which Defendants relied on promotions and collaborations to meet quarterly expectations.

135. For example, on June 4, 2024, Defendant Boswell claimed that "***partnerships and collaborations***" contributed to "***growing the core***." Similarly, Defendant Boswell labeled Adjacencies such as "***Lip, Hair, [and] Men's***" as "***year over year growth drivers***" and claimed that outside a brief increase in the first part of 1Q, Bath & Body Works was "no more promotional than ***we were last year***."

136. These statements were, again, false, as Defendant Heaf admitted at the end of the Class Period. Rather than collaborations "growing the core," Defendant Heaf explained "**the core** [was] **weaker**" during the Class Period, and that weakness was "**masked by promotions and collab**[**orations**]."

137. Additionally, Bath & Body Works's new product Adjacencies were not driving sales. Instead, as explained above, Defendant Heaf's admissions on November 20, 2025 made clear that the Adjacencies had failed to drive significant growth at the Company.

138. Throughout the remainder of 2024, Defendants continued to mislead investors about the Company's sales. On multiple dates, including on August 28 and November 25, 2024, Boswell reassured investors that the Company's Adjacencies were "***perform[ing] well***."

139. Then, when asked by an analyst on November 25, 2024, to elaborate on the performance of Adjacencies, Defendant Boswell doubled down, claiming that Bath & Body Works was "***pleased [] with the progress***," of Adjacencies, which were "***strong***," "***delivering as we expected***" and were "***contributing as well as the core***."

140. That same day, Defendant Boswell also claimed that the Adjacencies were **all** bringing in "***varying degrees of the percentage of customers that are new to the brand***." Defendant Boswell made similar false statements on December 4, 2024, when she claimed that Adjacencies were not only "***basket builders, but they also bring in new customers and so forth***."

141. These statements, like the others, were materially false and misleading when made because they assured investors that Adjacencies were performing well, driving sales, and attracting new customers. In reality, as would be revealed by Defendants themselves through a battery of shocking post-Class Period admissions, the Company's new product Adjacencies were not bringing in new customers and were, in fact, performing well below expectations.

142. Meanwhile, Defendant Rosen departed from the Company without public explanation. Specifically, on September 25, 2024, the Company announced that Rosen would step down and that her departure would be effective immediately. As part of her resignation, the Company eliminated the role of President of Retail, which meant that all functions that previously reported to Rosen would instead report to Defendant Boswell.

### G. The Truth Began to Emerge through Incremental Disclosures Revealing Bath & Body Works's Poor Sales Performance as CEO Boswell Abruptly Resigned

143. Rather than reveal the truth of Bath & Body Works's failed New Product Lines and, in the absence of sales from those new products, the Company's increasing reliance on risky promotions and collaborations to drive results, Defendants slow played the truth by trickling out information over a series of partial disclosures beginning in February 2025.

144. Eventually, unable to rely on gimmicks to prop up quarterly results, Bath & Body Works's sales and EPS fell, as the temporary boost of promotions and collaborations could not compensate for the inability of Adjacencies to drive sales. Still, even as Defendants were forced to reveal some of the effects of the fraud, they continued to hide both the true reason for the cause of the Company's poor performance and its full effects.

#### 1. On February 27, 2025, Defendants Revealed Reduced Guidance and Operating Margin

145. The first partial disclosure occurred on February 27, 2025, when the Company issued its earnings results for 4Q 2024 and updated its guidance. Notably, the Company issued softer-than-expected guidance, announcing that operating margin would stay at 17%, and lowering EPS outlook 7%, well below Wall Street's expectations.

146. As a result of these revelations, Bath & Body Works's stock declined by over 12%, a reduction of $5.22 per share, bringing the share price to $35.86.

147. Analysts reacted with concern. For example, Morgan Stanley noted that this guidance suggested the Company would "curtail[] profitability," and Piper Sandler warned that "margins will contract y/y [year-over-year]." UBS similarly expressed caution about lowering margin, noting the margin may further "regress[] as slow sales causes fixed cost deleverage and promotions increase."

148. Despite this revelation, Defendants continued to mislead investors about the success of the Adjacencies and the Company's reliance on promotions and collaborations.

149. For example, in a press release the Company issued that same day, Defendant Boswell was quoted as claiming "***Our strategy is working, and we are driving topline growth . . . by extending our reach through category adjacencies***." Similarly, the Company asserted in an investor presentation that it had "***[e]xpanded customer reach by growing adjacencies such as Men's, Hair, Lip, and Laundry***."

150. Defendant Boswell continued to insist on the February 27, 2025 earnings call that the Adjacencies were a smashing success and were driving sales growth. For example, she claimed that the Adjacencies were "***continu[ing] to materially outperform the shop***."[13] Boswell saved particular praise for the laundry Adjacency, asserting that it was "***an exciting platform that we believe is positioned for long-term growth***," and the Company was "***pleased with the early performance that followed the full rollout of Laundry in Q3***."

151. Investors, although rattled by the weaker-than-expected results, rallied around the Company's assurances. For example, Goldman Sachs reaffirmed its "buy" rating based on a belief in "growth in category adjacencies." Similarly, TD Cowen stated it had "confidence" in the Company because "adjacencies, which are ~10% of sales, continued to perform well."

---

[13] "Performing above shop" refers to growing faster or selling more than the Company as a whole.

152. Contrary to investors' understanding, and as set forth herein, Defendant Boswell's statements were false because the Adjacencies were not performing well and were failing to drive growth. As Defendant Heaf explained, "that strategy was not successful," and Adjacencies "**didn't achieve the growth that we expected**." This came as a shock to investors given Defendants' prior claims that the Company diligently tracked "**metrics on these new categories to see them hitting their sales**," which allowed them to reassure investors that adjacencies were "***delivering as we expected***." Moreover, Bath & Body Works's laundry care Adjacency, as described *supra*, had been massively underperforming since 2024. *See* Section IV.D, *supra*.

153. Bath & Body Works continued to mispresent its sales drivers after this partial disclosure, including by further claiming that Adjacencies were driving growth. For example, on March 14, 2025, Bath & Body Works claimed in its FY 2024 annual report that Bath & Body Works had "***Expanded our customer reach by growing category adjacencies such as Men's, Hair, Lip and Laundry***[.]"

### 2. As the Company's Performance Slid Further, Defendant Boswell Unexpectedly Stepped Down as CEO

154. Shortly after the truth began to emerge, Defendant Boswell abruptly resigned from the Company. Specifically, on May 19, 2025, the Company unexpectedly announced Defendant Boswell's departure. The Company provided no public reason for Defendant Boswell's departure, only stating that it was "effective immediately."[14]

155. The timing of and circumstances of Defendant Boswell's resignation strongly suggests that it was linked to the failure of the Adjacencies and the Company's over-reliance on

[14] Defendant Boswell also never publicly disclosed a reason for her departure and does not appear to have taken a role as an executive elsewhere since her resignation. According to The Clorox Company's website, Boswell currently sits as a member of its Board of Directors.

promotions and collaborations. Specifically, Defendant Boswell was the architect of the adjacency initiative, spearheaded the Company's increased focus on collaborations, and made many of the false and misleading statements in this case. Her resignation, made in the midst of the Company's gradual disclosures, is strongly indicative of fraud.

156. Analysts remarked on her unexpected departure by noting the length of her tenure and the risk that accompanies a leadership change of such magnitude. For example, analysts with Telsey Advisory Group commented on May 20, 2025 that "Boswell has helmed the company since 2022 . . . leadership transitions always present an element of risk, and the abruptness of yesterday's announcement was somewhat surprising."

157. Defendant Boswell was immediately replaced as CEO by Defendant Heaf. Upon his appointment on May 19, 2025, Heaf announced that he would promptly dive into the Company's strategy, and warned the Company may need to "focus, edit to amplify, fewer bigger things, and less breadth, more depth." In the months that followed, Defendants' charade continued to become untenable, and Defendants had no choice but to reveal the failing Adjacencies and the Company's dependence on promotions and collaborations to compensate for those failures, as the cause of Bath & Body Works's poor performance.

**3. On August 28, 2025, Defendants Revealed Increased Sales Weakness**

158. Bath & Body Works's financial results continued to slide as Defendants' increased reliance on promotions and collaborations were unable to cover up for sales weaknesses in a reliable or long-term way. On August 28, 2025, the Company released its financial results for 2Q 2025, which were well below the market's expectations.

159. For example, UBS noted that "2Q sales, margins, and EPS all came in below consensus," and TD Cowen warned that "softer than expected 2Q25 sales growth could be key

factors weighing on the stock." On this news, Bath & Body Works's stock price declined **by over 6%**, a reduction of $2.18 per share, bringing its share price down to $29.36 on August 28, 2025.

160. Nevertheless, Defendants continued to misrepresent what was driving the Company's sales, including claiming temporary and unsustainable strategies were "durable." For instance, the Company announced a new collaboration deal with Disney. Defendant Heaf boasted that the deal, which would include several distinct collaborations, would result in long-term, sustainable growth for the Company, claiming "***We're turning a one-off into a durable and profitable growth lever for this company***."

161. However, investors remained in the dark as to the fact that Defendants were relying on these risky collaborations to meet quarterly numbers, rather than drive durable growth. Indeed, as Defendant Heaf later revealed, not only had a recent Disney collaboration been a wholesale flop, but the Company's increasing dependence on collaborations had also become "**the difference between**" the Company meeting (or, as occurred, missing) its financial expectations.

### H. On November 20, 2025, Defendants Fully Revealed the Truth Behind Bath & Body Works's Poor Performance

162. On November 20, 2025, Bath & Body Works announced its earnings results for 3Q 2025. The results were a disaster. Adjusted EBITDA declined 22% year-over-year to $231 million; sales decreased 1% to $1.6 billion (well below expectations); and gross margin decreased 2.2% to 41.3%. Worse, Bath & Body Works materially cut guidance for the remainder of 2025, revealing the decline was systemic in nature and caused by Defendants' own conduct over the course of several previous quarters.

163. On the associated earnings call, Defendant Heaf admitted that Bath & Body Works's sales decline was attributable to the failure of Bath & Body Works's New Product Lines to attract new customers, as well as an overreliance on promotions and collaborations to

temporarily carry quarters in the absence of sales from the new product Adjacencies. Specifically, Defendant Heaf explained:

> Let me first give you the diagnosis in four clear points. Firstly, we pursued adjacencies to attract new consumers. **But that strategy has not delivered the growth we expected, and it reduced focus in investing in our core categories**. Secondly, **collaborations that should have been used to drive excitement, energy, and equity into our brand has been used to carry quarters**. Thirdly, as these strategies and other tactics have not delivered growth, **we have relied on deeper and more frequent promotions**. Great value and exciting deals have been part of our brand, and that will not change. However, **overreliance on promotion delivers diminishing returns and erodes brand equity, and that is what has happened here**. While all these efforts appealed to our existing consumers, **they did not grow our customer base** and we have not attracted a younger consumer. Finally, our organization has become slow and inefficient.

164. As a result of this failure, Defendant Heaf explained that Bath & Body Works would no longer be moving forward with the adjacency strategy, stating "[w]e are no longer going to invest in adjacencies," and additionally that the Company would entirely remove men's grooming and hair products from their stores.

165. Defendant Heaf further explained that Bath & Body Works's poor results and lowered guidance were the result of weakness in Bath & Body Works's core sales, which had been "**masked by promotions and collaborations**"—essentially conceding that Defendants had "masked" or concealed the Adjacencies' sales failures with these untenable practices. Defendant Heaf added that "if we look **across the last few years**," that "the growth we've delivered **was not durable**."

166. On this news, Bath & Body Works stock plummeted, tumbling $5.22 per share, or over 24%, to close at $15.82. Analysts were shocked by this news. Goldman Sachs remarked "the market was likely surprised with the de-emphasis of adjacent categories, given management's previous comments on adjacent category growth outperformance[.]"

167. Bank of America noted that the "**the magnitude of the reset caught us by surprise**[.]" And Morgan Stanley explained on November 20, 2025 that the "commentary around increased promotional activity" was "concerning," and announced the next day it would "move to the sidelines" because "the path to improved fundamentals is elongated, & in our view, potentially permanently out of reach."

168. After this disclosure, the market finally understood the truth: Bath & Body Works's core and customer base had not actually grown, its Adjacencies had not attracted new customers or delivered durable growth, and its sales had been boosted by an undisclosed reliance on temporary and unsustainable promotions and collaborations.

**I. Post-Class Period Admissions and Events**

169. Following the end of the Class Period, Defendants continued to make admissions that shed light on their fraud. These post-Class Period revelations further detail and demonstrate how Defendants misled the market during the Class Period.

170. On December 3, 2025, Defendants Heaf and Boratto attended the Morgan Stanley Global Consumer & Retail Conference. There, Heaf and Boratto further explained how the Company had over-relied on promotions and had failed to use Adjacencies to bring in new customers.

171. Specifically, Heaf made the following admission:

> Now, digging into the business on day one and really understanding what was going under the hood, we came to a number of conclusions about the business that we outlined on our last earnings call. Firstly, the strategy to move into adjacencies. So laundry, lip, hair, men's as good examples of those adjacencies that was done with the intention of driving both top line growth and acquiring new customers and **that strategy was not successful. It didn't achieve the growth that we expected. And perhaps most important, it didn't bring new consumers to the brand.** And the byproduct of that strategy, as we all know, business is about choices. **And we made choices in the prior years to invest our marketing money, invest our**

> **research and development money, invest in our packaging stages – restaging in those adjacencies. And as a result, we pulled time, money and attention away from our core.**

172. On that same day, December 3, 2025, Boratto then elaborated on and bolstered Heaf's November 20, 2025 admission that the Company had "**relied on deeper and more frequent promotions**" during the Class Period. Specifically, Boratto stated, "[a]s we look to 2026, right, it's our intent to not be incrementally promotional. As you know and as we've discussed **in many quarters, we have been incrementally promotional**," echoing Heaf's earlier admission.

173. Finally, Heaf admitted Bath & Body Works lacked any durable growth engines, stating: "I'm going to start by being a bit blunter, right. This business is not broken. **But what it doesn't have is durable growth levers**. So, Villains [a collaboration with Disney] was a miss."

174. Months later, on the May 27, 2026 1Q 2026 earnings call, Heaf echoed Boratto's admission about promotions, stating "**over the past several years, we have leaned into more frequent and deeper promotions to prop up the top line**. That does drive a short-term response, but over time, it creates diminishing returns and erodes brand equity."

175. That same day, the Company announced Defendant Boratto would step down from her role as CFO and depart the Company. Defendant Boratto's departure meant that all of the Individual Defendants, with the exception of Heaf, resigned from the Company during or in the wake of these disclosures.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

176. Lead Plaintiff alleges that Defendants' statements highlighted in bold and italics herein and detailed within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not

knowing. As alleged herein, such statements falsely and/or materially inflated and/or maintained the price of Bath & Body Works's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

177. Throughout the Class Period, Defendants made a series of misrepresentations and omissions concerning: (i) the success of Bath & Body Works's New Product Lines or Adjacencies; (ii) the degree to which Bath & Body Works's reliance on temporary measures such as promotions and collaborations were driving sales growth; and (iii) the sources and sustainability of Bath & Body Works's sales growth.

**A. February 29, 2024 – 4Q 2023 Earnings Call**

178. The Class Period begins on February 29, 2024, the day Bath & Body Works released its 4Q 2023 financial results for the quarter ended February 3, 2024.

179. On Bath & Body Works's earnings call that same day, on February 29, 2024, before the market opened, Defendant Rosen claimed that Bath & Body Works's Adjacencies were bringing in new customers. Specifically, Rosen stated:

> We're excited about completing the rollout of our fragrant hair care line to the North American fleet. ***This category has attracted a new customer to Bath & Body Works with 14% of fragrant hair care customers new to our brand. Lip products have attracted new, younger customers to our brand*** and represent an opportunity to expand our customer base.
>
> . . .
>
> Last quarter, we discussed the launch of our laundry line and our best-selling fragrances in a very limited number of stores and online. We have since rolled this out to just over 200 stores and have plans to continue to expand to roughly half of the US fleet in the fall. ***Like our other new categories, laundry has attracted new customers to the brand*** and their feedback has been positive, noting that laundry is yet another new and exciting way to add fragrance to their lifestyle and their daily routine.
>
> . . .

> So, our Men's Shop is fully rolled out to all stores. ***We know that Men's is attracting a younger customer and a slightly more diverse customer,*** and we have added some extra marketing here.
>
> . . .
>
> As Gina mentioned, we have finished the rollout of fragrant hair care to all stores this spring. ***And this is another line that we have learned that is attracting new customers to Bath & Body Works. 14% of fragrant hair care customers are new to our brand***.

180. Defendant Rosen's statements in ¶179 were materially false and misleading because, as described in Section IV.D, *supra*, Bath & Body Works's New Product Lines, known as "Adjacencies," of laundry, hair care, lip care, and men's grooming products, did not attract new customers to the brand, nor did they expand the total purchases or "basket size" of customers. Defendant Heaf admitted this to investors many times over at the end of the Class Period. For example, on November 20, 2025, Heaf admitted that the Adjacencies had "**not delivered the growth we expected, and it reduced focus in investing in our core categories**," and the Adjacencies "did not grow our customer base." Defendant Heaf also announced that the failure of these product lines was so severe that it meant the Company was "no longer going to invest in adjacencies."

181. Defendant Heaf provided additional detail to stunned investors on December 3, 2025, when he blatantly stated that the Adjacencies were "**not successful**," "**didn't achieve the growth that we expected**," and, critically, "**didn't bring new consumers to the brand**." These admissions stood in stark contrast to Defendants' statements touting that the Adjacencies attracted new customers. Worse, Defendant Heaf also admitted on December 3, 2025, that Defendants' aggressive pursuit of the failing Adjacencies "**pulled time, money and attention away from our core**," a fact that Defendants' misstatements concealed from investors by touting the Adjacencies' purportedly bolstering Bath & Body Works's brand.

182. Moreover, as set forth in Section IV.D, *supra*, the accounts of well-situated FEs within Bath & Body Works support that the Adjacencies were part of an aggressive expansion plan, spearheaded by Defendant Boswell that were failing by 2024 and weakened the Company's core.

183. For example, FE-3—a former Senior Central Planner—advised that, under the Company's former CEO, Gina Boswell, Bath & Body Works had developed a "very aggressive expansion plan" to add to the Company's bottom line and that the four adjacency product lines of men's grooming, lips, hair, and laundry were part of that plan.

184. According to FE-3, however, the lip, hair, and laundry adjacencies never "got off the ground," and none of them were large enough to "move the needle" to improve the bottom line. FE-3 added that Bath & Body Works did not get the traction in these areas that it needed for its aggressive expansion plan.

185. Additionally, according to FE-2—a former senior leader in product development—Bath & Body Works's core weakened once there was a focus on smaller categories and more emphasis on adjacencies. FE-2 also explained that those adjacencies were "not even remotely to scale with core" and "should have been meant to support."

186. Moreover, according to FE-1—a former supervisor who analyzed various product distribution and sales information—by 2024, laundry was clearly performing below projections. FE-1 recalled having business overview meetings with senior Bath & Body Works executives where it was discussed that laundry was not performing as well as initial projections. According to FE-1, "it wasn't a secret that laundry wasn't performing well."

187. FE-1 explained that he observed laundry products building up in distribution centers. According to FE-1, inventory deployment analysts pushed inventory to the stores based

on sales data. FE-1 explained that there was a surplus of laundry inventory building up in distribution centers because it was not being deployed to stores because it was not selling. According to FE-1, laundry stock in the warehouse would "sit there for months."

188. FE-1 also recalled lip care being a slower moving item. FE-1 recalled that lip care was placed in the training zone in the warehouse because of how few units were moving. According to FE-1, they used the product to train employees because they knew it did not move as fast as other products.

189. Further, as set forth in Section VII, *infra*, Bath & Body Works was fiercely committed, as both a brand and a retailer, to tracking its product sales through near-constant, real-time feedback. Indeed, Defendants frequently touted their rigorous tracking of the Adjacencies' success and, more broadly, Company sales performance. For example, on August 23, 2023, as the Adjacencies were being launched, Defendant Rosen explicitly stated that her knowledge of the adjacencies' success would continue to come "**from our data**" and that, as the Adjacencies rolled out, the Company would let investors "**know how we are tracking**." Similarly, during the Class Period, on August 28, 2024, Defendant Boswell described how the Adjacencies "**deliver against three other metrics that we track**," including a product attracting new and repeat customers.

190. Similarly, Defendant Boratto had the following exchange with an analyst.

> Answer – Eva C. Boratto: February traffic, thank you. So, overall, as I said, we came into February, traffic was pressured. We referenced that our initial floorset didn't perform to our expectations; we adjusted that. ***Performance has improved during the month; it's reflected in our outlook and the guidance range that we provided***.
>
> Question – Paul Lejuez: And is that performance improved during the month driven by promotions? Is that the message?
>
> Answer – Eva C. Boratto: ***No. No, I apologize. That was not my message***. Overall, we changed our floorset and promotions is

> always part of our strategy, but we're adapting and adjusting to our customers.

191. Defendant Boratto's statements in ¶190 were materially false and misleading because Bath & Body Works's performance **was** driven by promotions, as the Company was increasingly relying on promotions to meet its sales guidance. Defendants' admissions were clear insofar as they revealed, for example, as stated by Defendant Heaf on November 20, 2025, a degree of dependency on these risky, unsustainable tactics that amounted to "**the difference between**" Bath & Body Works meeting or missing guidance. Moreover, Defendant Heaf admitted that these temporary levers had been used to a greater degree "**over the past several years**," explaining that the Company had "**leaned into more frequent and deeper promotions to prop up the top line**" and that Bath & Body Works's collaborations were merely a mechanism to "**carry quarters**" rather than build brand excitement and equity.

### B. March 12, 2024 – Bank of America Consumer & Retail Conference

192. On March 12, 2024, Defendant Boratto attended the Bank of America Consumer & Retail Conference. There, in response to an analyst question about Bath & Body Works's new categories, Defendant Boratto stated:

> Yeah, so we've talked about a lot about our four key adjacencies, right; Men's, lip, hair and laundry. ***And these are all categories that bring fragrance first, that enable us to attract new customers, to increase share of wallet with our existing customers***.

193. Defendant Boratto's statement in ¶192 was materially false and misleading for the same reasons set forth in ¶180 through ¶189 and ¶191. Additionally, Defendant Boratto's statement was false and misleading because it represented that the Adjacencies' success purportedly enabled the Company to "attract new customers" and also to increase the "wallet" or basket size of existing customers—driving the Company's success on multiple fronts. However, Defendant Boratto's statements were belied by Defendant Heaf's admissions at the end of the

Class Period. For example, Heaf revealed on November 20, 2025, that the Adjacencies "**did not grow our customer base** and **we have not attracted**" new customer demographics. Moreover, Defendant Boratto's statement was false and misleading because it falsely claimed that the Adjacencies were driving sales, while omitting reference to the unsustainable, increasing reliance on promotions and collaborations that were used to prop up sales as the Adjacencies failed to perform.

### C. June 4, 2024 – 1Q 2024 Earnings Call

194. On June 4, 2024, Bath & Body Works held an earnings call conference discussing the Company's financial results for 1Q 2024 for the quarter ended May 4, 2025. On that call, Defendant Boswell stated:

> And we speak about ***growing the core, which these partnerships and collaborations do just that and then the more on the adjacencies is also critical***. Both of these, these are two of the four levers which we will rely on to inflect in the back half of the growth and so that's why we're so excited about it, because it's truly ***driving the inflection point at the mid-and-high point of our guidance***.

195. Defendant Boswell's statements in ¶194 were materially false and misleading. Specifically, it was false and misleading for Boswell to claim that partnerships and collaborations were "growing the core," when in truth, partnerships and collaborations were actually masking the fact that the core was not growing as the Adjacencies failed to bring in new customers, as described in Section IV.D, *infra*. Indeed, Defendant Heaf confirmed this was the case at the end of the Class Period, on November 20, 2025, by revealing that Bath & Body Works's poor results and lowered guidance were the result of weakness in Bath & Body Works's core sales, which had been "**masked by promotions and collaborations**." This was also clear on November 20, 2025, when Heaf admitted that "**it's clear to me that the core is weaker, and some of that was masked by promotions and collabs** and anniversarying [surpassing the one-year mark] some of those

adjacent product launches." Months later, May 27, 2026, Heaf remarked that the Company's high degree of reliance on collaborations had been ongoing "**over the past several years**" as the Company "**leaned into more frequent and deeper promotions to prop up the top line**."

196. It was further false and misleading to claim that Adjacencies were "***driving the inflection point at the mid-and-high point of [BBWI's] guidance***" because, as Defendant Heaf admitted on December 3, 2025, that Defendants' aggressive pursuit of the failing Adjacencies "**pulled time, money and attention away from our core**." Indeed, as set forth in ¶180 through ¶189, above, Defendants' misstatements such as the foregoing, concealed the truth from investors by touting the Adjacencies purportedly bolstering Bath & Body Works's brand and driving its ostensible success.

197. Defendant Boswell later added during that call:

> As we move through the quarter, we had strong floorsets with newness, and that enabled us to achieve flat AUR [Average Unit Retail] in the back part of the quarter. So we exited with flat AUR. So other than the first part of Q1, ***we were no more promotional than we were last year***, and we're back on plan to our AUR flat expectations.

198. Defendant Boswell's statement in ¶197 was materially false and misleading because the Company was increasingly promotional during the Class Period. Indeed, as Heaf would later admit on November 20, 2025 the Company had "**relied on deeper and more frequent promotions**" during the Class Period. *See* ¶172, *supra*. Defendant Boratto later confirmed this, when she explained on December 3, 2025 that Bath & Body Works **"ha[d] been incrementally promotional**" over the last several years. *See id.* This stood in stark contrast to Boswell's misstatement that the Company was "***no more promotional***," during the Class Period.

199. In an investor presentation also delivered on June 4, 2024 in connection with Bath & Body Works's earnings release, the Company claimed that "[*y*]***ear-over-year growth drivers included: Lip, Hair, Men's*** and Fine Fragrance Mist."

200. In addition, Defendants' statement in ¶199 was materially false and misleading for the same reasons set forth in ¶180 through ¶189, as well as ¶¶ 191, 195, and 198. Defendants' statement was additionally false and misleading because it provided investors with the misleading impression regarding the "drivers" of Bath & Body Works's growth. In reality, and unbeknownst to investors, the Adjacencies were not driving growth but were, as Defendant Heaf revealed on November 20, 2025, weakening core sales and leading the Company to "**mask**[]" or concealed the Adjacencies' sales failures with these untenable practices.

**D. August 28, 2024 – 2Q 2024 Earnings Call**

201. On August 28, 2024, BBWI held an earnings call conference discussing the Company's financial results for 2Q 2024 for the quarter ended August 3, 2024. On that call, Defendant Boswell stated:

> We're growing our new category adjacencies, opening new store locations and expanding in international geographies. ***Our adjacent categories of men's, hair, lip, and laundry continue to perform well***, particularly among existing customers. We're also focused on attracting new-to-brand customers with these categories.

202. Similarly, in an investor presentation released alongside the earnings call, the Company claimed that "***Men's, Hair, Lip and Laundry performing well***."

203. Defendants' statements in ¶¶201 and 202 were materially false and misleading for the same reasons set forth in ¶180 through ¶189, as well as ¶¶ 191, 195, and 198. Additionally, Defendants' statements were false and misleading because they falsely portrayed the purported successful performance of the Adjacencies as ongoing or continuing in nature, which led investors to believe that the Adjacencies' performance was unchanged and in line with publicly represented

expectations. However, unbeknownst to investors, and as Defendant Heaf would later admit on November 20, 2025, Defendants' focus on the Adjacencies had "**not delivered the growth we expected, and it reduced focus in investing in our core categories**." Moreover, Defendants revealed that the Company had masked the Adjacencies' failure to perform through unsustainable promotions and collaborations. Defendant Heaf's admissions demonstrated that the growth and purportedly high performance of the Adjacencies never occurred, as it failed to materialize at all during the Class Period.

### E. November 25, 2024 – 3Q 2024 Earnings Call

204. On November 25, 2024, the Company announced its 3Q 2024 financial results for the quarter ended November 2, 2024, and held an associated earnings call.

205. On that call, Defendant Boswell stated:

> On the second pillar of our five E strategy, extending our reach, we are growing our new category adjacencies, opening additional store locations, and expanding in international geographies to drive growth. Adjacencies are an opportunity to expand and diversify our product portfolio, applying our fragrance expertise to large addressable markets. We evaluate adjacent category performance based on their incrementality to the basket, repeat purchase rates, and ability to attract new customers. ***Our adjacent categories of men's hair, lip, and laundry continue to perform well***; and year-to-date represent approximately 10% of our business, with potential to become a larger percentage of our mix in 2025 and beyond.

206. Defendant Boswell's statement in ¶205 was materially false and misleading for the same reasons set forth in ¶180 through ¶189, as well as ¶¶ 191, 195, and 198. Additionally, Defendant Boswell's statement was false and misleading because the Company's sales were not driven by the Adjacencies "perform[ing] well," but rather by the Company's reliance "**on more frequent and deeper promotions to prop up the top line**," as revealed by Defendant Heaf on November 20, 2025. By representing to investors that the Adjacencies "***continue to perform well***," Defendants concealed that the Adjacencies' poor performance led the Company to increase its

undisclosed reliance on short-term, unsustainable promotions and collaborations to compensate for their ongoing failure. This compounded Defendants' false and misleading representation of ongoing positive performance of the Adjacencies by concealing the true driver of the Company's quarterly performance and the tremendous risk that accompanied relying on promotions and collaborations to, as Defendant Heaf admitted, "**carry quarters**."

207. On that call, Defendant Boswell further stated:

> Question – Kate McShane: Hi, good morning. Thanks for taking our question. Last quarter you mentioned that the adjacent categories were performing well, particularly with existing customers, but it was taking some time to build the brand awareness and generate a greater number of new-to-brand customers. I don't think we've heard similar language today and just wondered if anything has changed there?
>
> Answer – Gina R. Boswell: ***Actually, the adjacencies are delivering as we expected and there's a strong delivery there***. Nothing's changed from that perspective, although what we do watch is for adjacencies, we want to make sure that we've got the incrementality that is building the baskets. So no change, there it is. Repeat rates are still very strong, so we're excited by that. ***And depending on the category, whether it's men's, hair, lip, and laundry, varying degrees of the percentage of customers that are new to the brand. So, we're pleased, actually with the progress***. These are still at varying degrees of penetration and percentage of our total portfolio, but no change and ***they're contributing as well as the core***, so it's great to see that. Thank you. Next question, please.

208. Defendant Boswell's statements in ¶207 were materially false and misleading for the same reasons set forth in ¶180 through ¶189, as well as ¶¶ 191, 195, and 198. Defendant Boswell's statements were additionally false and misleading because they reinforced with investors that the Adjacencies were performing in line with the Company's publicly touted expectations, or "***as we expected and there's a strong delivery there***." However, the Adjacencies were not performing well or in line with expectations at all. Indeed, the opposite was true as the Adjacencies failed to sell with new or existing customers. Defendant Boswell's false

representation of "progress" for the New Product Lines stood in stark contrast with Defendant Heaf's admissions after the end of the Class Period that the Adjacencies had "**not delivered the growth we expected, and it reduced focus in investing in our core categories**" and that the Company had masked these flailing sales through unsustainable promotions and collaborations.

209. Finally, Defendant Boswell claimed:

> We have a wide variety of price points, but this agile model is about reflecting the current environment. We do rigorous testing on these promotions, which impact AUR, and ***we are ensuring that they're accretive to both sales and margin dollars***. So, we're going to continue to leverage that model, that speed and scale and the promo capabilities that we have to position the company for top and bottom line growth.

210. Defendant Boratto's statement in ¶209 was materially false and misleading for the reasons set forth in ¶¶ 191, 195, and 198. Specifically, the Company was relying "**on more frequent and deeper promotions to prop up the top line**," as revealed by Defendant Heaf on November 20, 2025. These promotions were not only damaging to sales in the long term, but also significantly reduced the Company's margin.

**F. December 4, 2024 – Morgan Stanley Global Consumer & Retail Conference**

211. On December 4, 2024, Defendant Boswell attended the Morgan Stanley Global Consumer & Retail Conference, where she had the following exchange with an analyst:

> Question – Alex Straton: Perfect. I'm probably beating a dead horse here on revenue questions. So, we have so many different pillars happening for you all, and one of them is the adjacencies that Gina mentioned; men, lips, hair, laundry, et cetera. Can you walk us through those opportunities? They've been newer for you in the last two years, some just this year, which I guess have seemed like the more compelling opportunities or less after you've learned a little bit, and how we should think about those longer term?
>
> Answer – Gina R. Boswell: Yeah. Yeah. So, these adjacent categories, the role of which is really to expand and diversify our portfolio in the stores and bring our fragrance expertise to life through new and different forms, right? ***And so, ultimately, they're***

> ***basket builders, but they also bring in new customers and so forth***. Last quarter, we spoke I think in first – for the first time dimensionalize the size of them in aggregate. So, these adjacent categories; men's, lip, laundry and hair, represent about 10% of our portfolio. And in the third quarter, they grew above shop as they had been consistently for the first half.

212. Defendant Boswell's statement in ¶211 was materially false and misleading for the same reasons set forth in ¶180 through ¶189, as well as ¶¶ 191, 195, and 198. Defendant Boswell's statement was additionally false and misleading because the Adjacencies were not "***basket builders***" nor did they "***bring in new customers***;" as Defendant Heaf admitted after the Class Period ended, the Adjacencies were "**not successful**," and "**didn't bring new consumers to the brand**." Indeed, the performance of the Adjacencies was so poor that Bath & Body Works cut their investment in the Adjacencies upon admitting to investors that they were a wholesale failure. Defendant Boswell's statement also failed to disclose the source that was actually driving the Company's quarterly numbers—an unsustainable dependence on brand-eroding and volatile promotions and collaborations. As Defendant Heaf revealed at the end of the Class Period, the Company's declining sales (left by the Adjacencies' failure) was "**masked by promotions and collaborations**" and that "**across the last few years**," that "the growth we've delivered **was not durable**."

### G. February 27, 2025 – 4Q 2024 Earnings Call

213. On February 27, 2025, Bath & Body Works announced its earnings results for 4Q 2024 for the quarter ended February 1, 2025. That same day, the Company issued the following press release:

> Gina Boswell, CEO of Bath & Body Works, commented, "Our team delivered strong performance that exceeded expectations on both the top and bottom line in the critical fourth quarter. This success was driven by our product innovation, strong execution and the outstanding customer experience provided by our associates." Boswell added, "***Our strategy is working, and we are driving***

> ***topline growth*** through product innovation, enhanced marketing and technology, ***and by extending our reach through category adjacencies*** and international expansion. Despite complex challenges facing the broader retail sector, we ended the second half of the year strong. As we enter 2025, we have a lot to be excited about, and we are eager to build on our momentum."

214. Defendant Boswell's statements in ¶213 were materially false and misleading for the same reasons set forth in ¶180 through ¶189 and ¶195. Defendants' statements were additionally false and misleading because they specifically misrepresented that the Adjacencies were "***driving topline growth***" through "***extended reach***" of customers. This topline growth and extended reach, however, never came from the Adjacencies. Indeed, Defendant Heaf's revelations stated in unequivocal terms that the Adjacencies had failed to achieve growth or bring in new customers in a way that drove the Company's "top line." Indeed, the "top line" was in such jeopardy from the failed Adjacencies that, as Heaf admitted, the Company had "**leaned into more frequent and deeper promotions to prop up the top line**," a practice that had been going on "**over the past several years**." Furthermore, the Company did not "***extend[] our reach through category adjacencies***." In truth, and as Heaf admitted, the Adjacencies were "**not successful**," and "**didn't bring new consumers to the brand**."

215. That same day, the Company held an earnings call where they discussed financial results of the previous quarter with investors. On that earnings call, Defendant Boswell stated:

> Finally, we made progress extending our reach this quarter through growth in our adjacent categories and international expansion. We believe adjacencies are an opportunity to expand and diversify our product portfolio, applying our fragrance expertise and leadership to large addressable markets. ***Our adjacent categories of Men's, Hair, Lip and Laundry continue to materially outperform the shop***. For the year, they represented approximately 10% of our business with potential to become a larger percentage of our mix in 2025 and beyond.

216. On the associated investor presentation, the Company claimed "Adjacencies: ***Expanded customer reach by growing adjacencies such as Men's, Hair, Lip, and Laundry***[.]"

217. Defendants' statements in ¶¶215 and 216 were materially false and misleading for the same reasons set forth in ¶180 through ¶189, as well as ¶¶ 191, 195, and 198. Defendants' statements were additionally false and misleading because the Adjacencies were not "***growing***" because they had never sold in the first place and were becoming a drag on the Company's sales and operations. Indeed, these Adjacencies were not "***continuing to outperform the shop***," but instead were creating inefficiencies and sales gaps within the shop that prompted Defendants to lean into risky promotions and collaborations just to meet the expectations they put out to investors. This was made plain by Defendant Heaf's admissions after the end of the Class Period that Defendants' investments in the adjacencies "**pulled time, money and attention away from our core**" and, as a result of Defendants' efforts to mask the Adjacencies' failure, it now lacked "**durable growth levers**." *See* ¶173, *supra*.

### H. March 14, 2025 – Annual Report FY 2024.

218. On March 14, 2025, the Company released its 10-K annual report for fiscal year 2024. In the 10-K, Defendants claimed that Bath & Body Works had "***Expanded our customer reach by growing category adjacencies such as Men's, Hair, Lip and Laundry***[.]"

219. Defendants' statement in ¶218 was materially false and misleading for the same reasons set forth in ¶180 through ¶189, as well as ¶¶ 191, 195, and 198. Defendants' statement was additionally false and misleading because the Adjacencies had not "***expanded***" Bath & Body Works's "***customer reach***" nor "***grown***." In truth, as Heaf admitted mere months later, the Adjacencies were "**not successful**," and "**didn't bring new consumers to the brand**." Indeed, by the time this statement was made, unbeknownst to investors, Defendant Boswell—the Company's CEO who had spearheaded the New Product Lines—was on the precipice of

announcing her surprising resignation, as the Company continued to reveal signs of slipping performance. Indeed, the Adjacencies, which had been launched in or around 2023, were performing so poorly that the Company would, just months later, reveal that it was pulling the products from shelves and canceling its investment in them.

### I. August 28, 2025 – 2Q 2025 Earnings Call

220. On August 28, 2025, the Company announced its 2Q 2025 financial results for the quarter ended August 2, 2025, and held an associated earnings call. On that call, Defendant Heaf stated:

> Secondly, we are focused on consistent, durable and profitable growth levers. And so the announcement of our signing a multi-year deal with Disney is exciting. ***We're turning a one-off into a durable and profitable growth lever for this company.*** It will be the first of many that we'll be talking about in the coming quarters.

221. Defendant Heaf's statement in ¶220 was materially false and misleading for the same reasons set forth in ¶195. It was additionally false and misleading for Defendant Heaf to claim that the collaborations were a "***durable and profitable growth lever for the Company***" when he would later admit "what [the Company] **doesn't have is durable growth levers**," calling out in particular as an example that "Villains [a Bath & Body Works collaboration with Disney] was a miss." *See* ¶173, *supra*.

## VI. LOSS CAUSATION/ECONOMIC LOSS

222. Defendants' materially false and misleading statements and omissions alleged above directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Defendants' material misstatements and omissions were widely disseminated to the securities markets, investment analysts, and the investing public and had the effect of creating unrealistically positive assessments and characterizations of Bath & Body Works and its business, prospects, operations, and results which caused the Company's common stock to be overvalued

and artificially inflated throughout the Class Period. Lead Plaintiff and other Class members purchased or otherwise acquired Bath & Body Works common stock at prices that were artificially inflated by Defendants' misrepresentations and omissions of material facts alleged herein.

223. As alleged above, during the Class Period, Defendants publicly issued materially false and misleading statements and omissions of material fact regarding: (i) the success of Bath & Body Works's New Product Lines or Adjacencies; (ii) the degree to which Bath & Body Works's reliance on temporary measures such as promotions and collaborations were driving sales growth; and (iii) the sources and sustainability of Bath & Body Works's sales growth. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their shares of Bath & Body Works common stock at the artificially inflated prices that they were offered at.

224. As certain relevant and true facts became known and/or the risks previously concealed by Defendants' material misstatements and omissions materialized, the artificial inflation was removed from the price of Bath & Body Works common stock, causing the losses of Lead Plaintiff and other Class members. The timing and magnitude of Bath & Body Works's common stock price declines negates any inference that the losses suffered by Lead Plaintiff and the other members of the Class were caused by changed market conditions, macroeconomics or industry factors, or over Company-specific facts unrelated to Defendants' fraudulent conduct.

225. Specifically, on February 27, 2025 and August 28, 2025, the foreseeable risks and relevant truth concealed by Defendants' Class Period misstatements and omissions concerning Bath & Body Works's Adjacencies, collaborations, promotions, and sales were partially disclosed and/or revealed. Indeed, each of these partial corrective disclosures, discussed above, *see* Section IV.G, *supra*, and herein, partially revealed the relevant truth and foreseeable risks previously

misrepresented and/or concealed by Defendants' materially false and misleading statements and omissions. It was not until the final corrective disclosure and/or materialization of the concealed risk on November 20, 2025 that the full truth was known to the market, such that there was no longer any artificial inflation and/or artificial maintenance in Bath & Body Works's stock attributable to the fraud.

### A. February 27, 2025—First Partial Corrective Disclosure/Materialization of the Concealed Risk

226. On February 27, 2025, before the market opened, the relevant truth and foreseeable risks concealed by Defendants concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when Bath & Body Works announced its earnings results for 4Q 2024.

227. Specifically, the Company issued guidance well below Wall Street expectations, lowering its EPS 7% and announcing that its operating margin would stay stuck at 17%.

228. The February 27, 2025 announcement about the Company's lowered outlook and compressed margins were foreseeable consequences of and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the Company's sales, including the role that Adjacencies, collaborations, and promotions played in driving those sales. Specifically, Bath & Body Works's stagnant sales, compressed margin, and lowered EPS suggested to investors that sales were slowing and promotions were increasing.

229. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Bath & Body Works common stock declined over 12%, a reduction of $5.22 per share, bringing the share price down to $35.86 on February 27, 2025.

230. Analysts linked the stock drop to the Company's disclosure about margin and EPS. Morgan Stanley noted that this guidance suggested the Company would "curtail[] profitability," and Piper Sandler warned that it now believed that "margins will contract y/y." UBS similarly expressed caution about the Company's margin continuing to compress, noting the margin may further "regress[] as slow sales causes fixed cost deleverage and promotions increase."

231. Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal from investors the extent to which the Company relied on promotions and collaborations to drive sales growth, while misrepresenting the role of Bath & Body Works's Adjacencies in driving growth. For example, Defendant Boswell claimed "[***o***]***ur strategy is working, and we are driving topline growth . . . by extending our reach through category adjacencies***."

232. Investors, unaware that Adjacencies were not actually driving the Company's growth, were reassured by Defendants' continued false statements. For instance, TD Cowen stated it had "confidence" in the Company because "adjacencies, which are ~10% of sales, continued to perform well."

### B. August 28, 2025—Second Partial Corrective Disclosure/Materialization of the Concealed Risk

233. On August 28, 2025, before the market opened, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when Bath & Body Works announced its earnings results for 2Q 2025. Specifically, Defendants disclosed that Bath & Body Works's sales, margins, and EPS all would come in below consensus.

234. The August 28, 2025 announcement about the Company's lowered outlook and compressed margins were foreseeable consequences of and within the zone of risk concealed by,

Defendants' misrepresentations and omissions concerning the Company's Adjacencies, collaborations, promotions, and sales. In other words, the margin and EPS dropped due to overreliance on promotions and collaborations, and sales dropped as promotions and collaborations were unable to compensate for the failure of the core products and Adjacencies to drive sales.

235. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Bath & Body Works common stock declined over 6%, a reduction of $2.18 per share, bringing the share price down to $29.86 on August 28, 2025.

236. Investors connected the decline in stock prices to the Company's disclosure. For instance, TD Cowen explained that "softer than expected 2Q25 sales growth could be key factors weighing on the stock."

237. Still, the Company's stock price remained artificially inflated even after this news, as Defendants continued to conceal from investors the extent to which the Company relied on promotions and collaborations, the success of Adjacencies, and the drivers of sales growth. Furthermore, Defendants continued to make false and misleading statements about the sustainability of its collaboration and promotion strategies, with Defendant Heaf claiming "***We're turning a one-off into a durable and profitable growth lever for this company***."

238. Analysts were comforted by these reassurances, with UBS raising its "3Q25 sales growth outlook given greater expected contribution from [Bath & Body Works]'s Disney Villains collaboration[.]" Accordingly, the market remained unaware of the full truth.

### C. November 20, 2025—Final Corrective Disclosure/Materialization of the Concealed Risk

239. On November 20, 2025, before the market opened, the full truth and foreseeable risks regarding: (i) the success of Bath & Body Works's Adjacencies; (ii) the source and sustainability of Bath & Body Works's sales growth; and (iii) the extent to which Bath & Body Works was relying on temporary measures such as promotions and collaborations to drive sales growth were revealed and materialized. On this date, the Company released its earnings results for 3Q 2025, revealing that its EBITDA, sales, and margin all were well below both expectations. Additionally, the Company cut guidance for the remainder of 2025 and announced a major strategy reset.

240. Defendants attributed the decline to four major factors. As Defendant Heaf explained:

> Firstly, we pursued adjacencies to attract new consumers. But that strategy **has not delivered the growth we expected, and it reduced focus in investing in our core categories**. Secondly, collaborations that should have been used to drive excitement, energy, and equity into our brand has been **used to carry quarters**. Thirdly, as these strategies and other tactics have not delivered growth, **we have relied on deeper and more frequent promotions**. Great value and exciting deals have been part of our brand, and that will not change. However, overreliance on promotion delivers diminishing returns and erodes brand equity, and that is what has happened here. **While all these efforts appealed to our existing consumers, they did not grow our customer base and we have not attracted a younger consumer**. Finally, our organization has become **slow and inefficient**.

241. In addition to the above attributions, Heaf also admitted that "if we look across the **last few years**," that "the growth we've delivered **was not durable**."

242. Finally, Heaf noted that there had been "underinvestment in our core" due to a "focus on adjacencies." As Heaf explained, "the core is weaker, and some of that was masked by promotions and collabs and anniversarying some of those adjacent product launches."

243. As a direct and proximate cause of this corrective disclosure and/or risk materialization, shares of Bath & Body Works stocks declined another $5.22 per share, or over 24%, from $21.04 on November 19, 2025 to $15.82 on November 20, 2025, thereby removing the artificial inflation from Bath & Body Works stock.

244. Analysts, shocked by these revelations, linked the stock drop to the Company's disclosures. Goldman Sachs remarked "the market was likely surprised with the de-emphasis of adjacent categories, given management's previous comments on adjacent category growth outperformance[.]" Bank of America noted that the "the magnitude of the reset caught us by surprise[.]" And Morgan Stanley explained on November 20, 2025 that the "commentary around increased promotional activity" was "concerning," and announced the next day it would "move to the sidelines" because "the path to improved fundamentals is elongated, & in our view, potentially permanently out of reach."

245. Accordingly, investors finally learned the truth: the Company's Adjacencies had not attracted new customers or driven sales, its core had materially weakened, and it had over-relied on unsustainable promotions and collaborations.

## VII. ADDITIONAL INDICIA OF SCIENTER

246. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Bath & Body Works's materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A. Defendants' Admissions Support an Inference of Scienter

247. At and after the end of the Class Period, Defendants made a series of admissions that support an inference of scienter. First, Defendant Heaf admitted that the Company's Adjacencies did not drive growth or attract customers, which directly contradicted earlier statements by Defendants. Specifically, on November 20, 2025, Defendant Heaf admitted:

> "Firstly, we pursued adjacencies to attract new consumers. But that strategy **has not delivered the growth we expected, and it reduced focus in investing in our core categorie**s . . . While all these efforts appealed to our existing consumers, they **did not grow our customer base and we have not attracted a younger consumer**.

248. Then, just two weeks later, on December 3, 2025, Defendant Heaf elaborated on his earlier admissions by stating:

> Firstly, the strategy to move into adjacencies. So laundry, lip, hair, men's as good examples of those adjacencies that was done with the intention of driving both top line growth and acquiring new customers and that strategy was not successful. **It didn't achieve the growth that we expected. And perhaps most important, it didn't bring new consumers to the brand**.

249. Similarly, with respect to Bath & Body Works overreliance on promotions and collaborations during the Class Period, Defendant Heaf specifically admitted on November 20. 2025 that:

> Secondly, collaborations that should have been used to drive excitement, energy, and equity into our brand **has been used to carry quarters**. Thirdly, **as these strategies and other tactics have not delivered growth, we have relied on deeper and more frequent promotions**.

250. Defendant Heaf's statements, which revealed that the purported success of the Adjacencies that Defendants touted during the Class Period never actually occurred, and that the Company had over relied on promotions and collaborations during the Class Period, are compelling evidence of scienter. Defendants' admissions make clear that they knew, or were

reckless in not knowing, that (i) Adjacencies did not bring in new customers to the Company or expanded customers' purchases; and (ii) Bath & Body Works relied on unsustainable promotions and collaborations to drive sales growth and make quarterly numbers.

**B. The Accounts of FEs of Bath & Body Works Support an Inference of Scienter**

251. The accounts of FEs also make clear that the individual Defendants closely monitored sales performance vigorously. *See* Section IV.D, *supra*. As a result, Defendants' misstatements concerning sales and the performance of the Adjacencies, collaborations, and promotions were made with scienter and/or reckless disregard for their truth.

252. For example, FE-2—a former senior leader in product development—described that Bath & Body Works was "built on a rigorous meeting cadence." FE-2 attended weekly meetings with Bath & Body Works's Chief Supply Chain Officer every Thursday, who met at least once a week with CEO Boswell. According to FE-2, the C-Suite also met weekly every Wednesday. FE-2 added that he recalled a Monday night meeting where sales from the weekend were discussed. According to FE-2, there was a chain of communications every day.

253. Additionally, FE-1—a former supervisor who analyzed various product distribution and sales information—recalled receiving communications from senior leaders, including a Senior Operations Manager at Bath & Body Works about the poor performance of the laundry line. FE-1 detailed that, in addition to email communications about laundry, there were also verbal communications about the poor performance of laundry from Bath & Body Works executives like the Company's Director of Operations.

254. Additionally, FE-1 explained that the department that he oversaw was the "brains of the e-commerce building" in Ohio. According to FE-1, the e-commerce building was known internally as "DC-9" or "Warehouse 21," which was responsible for shipments all over the U.S.

He added that his department was responsible for the planning, execution, and research and resolve for all orders coming out of DC-9.

255. FE-1 recalled members of the C-Suite visiting Warehouse 21 for a meeting in August or September 2024. While he was not directly involved in that meeting, however, he knows that laundry products were discussed, including the performance of that product line, packaging, shipping and customer complaints.

256. According to FE-1, everyone in the warehouse knew about this C-Suite visit because they had to prepare the building for them. FE-1 also explained that what was going to be discussed at the meeting was a topic of conversation around the warehouse. FE-1 recalled being able to see the slides that they had up for the meeting from the warehouse floor. FE-1 added that these slides referenced adjacencies such as laundry, hair, and lip.

257. In addition to the accounts of these FEs, an interview of an anonymous former employee, described as a "former Associate Vice President" of Bath & Body Works and published on the AlphaSense financial research platform on December 29, 2023, further details and bolsters Bath & Body Works's formal and vigorous commitment to tracking sales performance under Defendant Boswell's leadership leading into the Class Period. The interview quotes the anonymous former employee as recounting:

> [A] monthly process that's formalized and with all the way up to the CFO or COO, I guess, in this case, where **there is a review of sales performance versus plan versus last year, margin performance versus plan versus last year, inventory ownership** open to buy. That's **a very strong disciplined place**. And then just informal reviews during the month with leaders in each one of the category functions. So, with the head of MP and I, merchant planning and inventory management **taking place basically on every Monday to make sure the things aren't off the rails within a month too**.

258. This account is noteworthy insofar as the anonymous former employee describes a formalized, monthly process running directly to the Company's C-suite, built on a "**very strong**

**disciplined pace**" to ensure that the Company could take action "**within a month**" in response to sales data.

259. Moreover, Defendants themselves openly boasted that they closely monitored sales, promotions, collaborations, and Adjacencies, explaining they knew precisely how promotional Bath & Body Works was or how many customers Adjacencies were bringing in.

260. For example, during a Company earnings call on August 23, 2023, Defendant Rosen claimed:

> As far as customers go over the year, **we do know from the data** that men's is bringing in new customers and more customers who identify as male and now customers also skew younger, **we know that from our data**. The other thing we are starting to see, but these are early stages, is that our lip product is also engaging a younger customer. So as we roll out hair and laundry and lip and continue to test, optimize and work with men's, **we will grab the data and continue to let you know how we are tracking**.

261. Similarly, on August 28, 2024, during a Company earnings call, Defendant Boswell claimed:

> Overall, those new categories, we're pleased to see that they met their plans in the quarter, but even more importantly, I think that you're alluding to is what else do they bring. We're satisfied on a couple of levels. First, these are large addressable markets. Not only do they meet the sales expectations for these specifically men's hair, laundry and lip is what I'm referring to, **but they deliver against three other metrics that we track. The first is how many new-to-brand customers do they bring, right, in addition to shop the entire shop**. Secondly, the repeat, which we like what we see on the repeat usage behavior. Thirdly, the **incrementality, which we're monitoring**. It varies, but we like what we see on incrementality as well. **To see those three metrics on these new categories to see them hitting their sales** and to the fact that some of them are not fully rolled out, I believe laundry will just be fully rolled out next month, then we can turn on full marketing to drive accelerated growth from there.

262. And, again during a Company earnings call on November 25, 2024, Defendant Boswell stated: "We evaluate adjacent category performance based on their incrementality to the basket, repeat purchase rates, and ability to attract new customers."

### C. Defendants' Class Period Misstatements Themselves Support a Strong Inference of Scienter

263. As discussed above in Section V, *supra*, the Individual Defendants spoke at length during the Class Period about Bath & Body Works's New Product Lines, promotions and collaborations, as well as the ostensible degree to which each were sources of sales growth. Defendants' Class Period misstatements themselves demonstrate that they were aware of or, at the very least, were reckless in not knowing the truth of those topics that were revealed at the end of the Class Period. Accordingly, Defendants breached their duty under the federal securities laws by speaking about these topics and failing to fully disclose all relevant material information while doing so.

#### 1. Defendants' Statements Regarding the Purported Success of Bath & Body Works's Adjacencies Support a Strong Inference of Scienter

264. Throughout the Class Period, Defendants repeatedly touted that Bath & Body Works's New Product Lines, known as Adjacencies, were driving sales by bringing in new customers and expanding customers' baskets. The frequency, scope, and certainty of Defendants' statements regarding the Adjacencies demonstrate their knowledge of, or reckless disregard for, the factual basis underlying these statements. For example, on February 29, 2024, Defendant Rosen claimed, "[*l*]***ike our other new categories, laundry has attracted new customers to the brand***." Similarly, on March 12, 2024, Defendant Boratto claimed that Adjacencies were "***all categories that bring fragrance first, that enable us to attract new customers***." And Defendant Boswell claimed on December 4, 2024 that the Adjacencies "***also bring in new customers and so forth***."

265. Defendants' repeated assurances that the Adjacencies were bringing in new customers and driving sales, when in fact the Adjacencies did not bring in new customers or drive sales, demonstrate that they either knew that their statements were false, or were reckless in not knowing and investigating that this was the case. In either scenario, there is a strong inference that Defendants made these statements with scienter.

266. Moreover, Defendants spoke repeatedly and openly about the Adjacencies with the public, including repeatedly volunteering that the Adjacencies were attracting new customers and driving sales. Repeated discussion of a topic with analysts, particularly when done with an intent to emphasize and induce reliance on the topic, supports an inference of scienter.

**2. Defendants' Statements Regarding the Company's Degree of Reliance on Promotions and Collaborations Support a Strong Inference of Scienter**

267. Similarly, Defendants repeatedly assured investors that the Company was tracking promotions and collaborations and that the Company was emphatically not relying on those to drive sales, but rather to grow the core. This demonstrates Defendants' knowledge of, or reckless disregard for, the basis of such statements. For example, during a Company earnings call on June 4, 2024, Defendant Boswell claimed that "***partnerships and collaborations***" contributed to "***growing the core***," and also claimed outside a brief increase in the first part of 1Q, Bath & Body Works was "***no more promotional than we were last year***." Likewise, during a Company earnings call on November 25, 2024, Defendant Boratto claimed "We do rigorous testing on these promotions, which impact AUR [Average Unit Retail], and ***we are ensuring that they're accretive to both sales and margin dollars***."

268. Defendants' repeated assurances that Bath & Body Works's degree of reliance on promotions and collaborations was not harmful to margins and grew the core demonstrated that they either knew that their statements were false or were reckless in not knowing and investigating

that this was the case. In either scenario, there is a strong inference that Defendants made these statements with scienter.

269. Moreover, Defendants spoke repeatedly and openly about promotions and collaborations with the public, including by offering repeated assurances to investors that promotions and collaborations grew the core and did not reduce margins. Repeated discussion of a topic with analysts, particularly when done with an intent to emphasize and induce reliance on the topic, supports an inference of scienter.

### D. The Individual Defendants' Suspiciously Timed Departures Support an Inference of Scienter

270. As described in Section IV.F-G, *supra*, three of the four Individual Defendants resigned from Bath & Body Works within twenty months. Indeed, the only Individual Defendant who did not resign during this short period—Defendant Heaf—was brought into the Company to replace Defendant Boswell on May 19, 2025, "effective immediately." The timing and circumstances of the resignations of Defendants Rosen, Boswell, and Boratto are highly suspicious and further support a strong inference of scienter.

271. First, Defendant Rosen resigned on September 25, 2024. In connection with her departure, Rosen's role as President of Retail was eliminated, which meant that all functions that previously reported to Rosen would instead report to Defendant Boswell. No reason was publicly given by the Company for Defendant Rosen's resignation, with the Company claiming that her departure was "mutual." The timing of her departure and the lack of a publicly disclosed rationale support an inference that her departure was connected to the allegations in the Complaint.

272. Then, Defendant Boswell resigned on May 19, 2025. Again, the Company provided no public reason for Defendant Boswell's departure, stating only that it was "effective

immediately." The timing of the departure and the lack of publicly disclosed rationale support an inference that her departure was connected to the allegations in the Complaint.

273. Several months after Defendant Boswell's departure, on November 20, 2025, Defendant Heaf, who took over Boswell's role as CEO, admitted that the Company's New Product Lines, or Adjacencies, had failed, as well as that Bath & Body Works had over relied on collaborations and promotions to compensate for flailing sales. Defendant Heaf announced that the Company would be deemphasizing collaborations and moving out of certain Adjacencies—the initiatives Defendant Boswell had championed.

274. Finally, on May 27, 2026, the Company announced that Defendant Boratto resigned. Although the Company claimed that Boratto had resigned to pursue another professional opportunity, the timing of her departure and Boratto's role in the fraud supports an inference that her resignation is connected to the allegations in the Complaint.

275. When considered holistically and in combination with (i) Rosen's, Boswell's, and Boratto's championing of Adjacencies and collaborations; (ii) the magnitude, persistence, and close temporal proximity of the financial impacts the Company disclosed; and (iii) the remedial measures taken by the Company shortly after Defendant Boswell's departure, the circumstances surrounding the departures of Rosen, Boswell, and Boratto are strongly indicative of scienter.

## VIII. CONTROL PERSON ALLEGATIONS

276. The Individual Defendants, by virtue of their high-level and controlling positions at Bath & Body Works, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the

materially misstated information conveyed to the public was the result of the collective actions of these individuals.

277. Defendants Boswell, Heaf, Boratto, and Rosen, as senior executive officers of Bath & Body Works—a publicly-held company whose stock was, and is, traded on the NYSE, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, as well as to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Bath & Body Works publicly traded common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

278. Defendants Boswell, Heaf, Boratto, and Rosen, because of their positions of control and authority as senior executive officers of Bath & Body Works, were able to and did control the content of Bath & Body Works's SEC filings, press releases, and other public statements issued by or on behalf of Bath & Body Works during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected.

279. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

## IX. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

280. Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Lead Plaintiff and other members of the Class purchased Bath & Body Works's publicly traded common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

281. At all relevant times, the market for Bath & Body Works shares was efficient for the following reasons, among others:

(a) Bath & Body Works's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Bath & Body Works filed periodic public reports with the SEC and the NYSE;

(c) Bath & Body Works regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(d) Bath & Body Works was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.

Each of those reports was publicly available and entered the public marketplace.

282. As a result of the foregoing, the market for Bath & Body Works securities promptly digested current information regarding Bath & Body Works from publicly available sources and reflected such information in Bath & Body Works's securities price(s). Under these circumstances, all persons and entities who or which purchased or otherwise acquired Bath & Body Works's common stock during the Class Period suffered similar injuries through their purchase of Bath & Body Works common stock at artificially inflated prices and thus, the presumption of reliance applies.

283. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Bath & Body Works's common stock.

284. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Bath & Body Works common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

285. To the extent that Defendants concealed or improperly failed to disclose material facts with respect to Bath & Body Works's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

286. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately

identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks Defendants warned of had already come to pass.

287. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

288. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

289. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements. To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested.

290. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, or the forward-looking statement was authorized or approved by an executive officer of Bath & Body Works who knew that the statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

291. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities who or which during the period from February 29, 2024 and November 19, 2025, inclusive, purchased the publicly traded common stock of Bath & Body Works were damaged thereby ("the Class"). Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, or control person of Bath & Body Works during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Bath & Body Works's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

292. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bath & Body Works's common shares were actively traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BBWI." According to Bath & Body Works's Form 10-Q, dated November 20, 2025, as of November 14, 2025, 204,721,605 shares of Bath & Body Works stock were outstanding. Although the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members of the proposed Class. Millions of Bath & Body Works shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be

identified from records maintained by Bath & Body Works or its transfer agent and can be notified of the pendency of this action by mail and publication using forms of notice similar to those customarily used in securities class actions.

293. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' wrongful conduct as complained of herein.

294. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

295. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the statements made by Defendants to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c) Whether, and to what extent, the market price of Bath & Body Works common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) Whether Defendants acted with the requisite level of scienter;

(e) Whether the Individual Defendants were controlling persons of Bath & Body Works; and

(f) Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

296. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it practically impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

297. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine, as discussed in Section IX, *supra*.

298. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## XII. CLAIMS FOR RELIEF

### COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

299. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

300. This Count is asserted against Defendants Bath & Body Works, Boswell, Heaf, Boratto, and Rosen for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

301. As alleged, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact

and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiff and the Class; (ii) artificially manipulate the price of Bath & Body Works common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Bath & Body Works common stock at artificially inflated prices.

302. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

303. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Bath & Body Works common stock during the Class Period.

304. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Bath & Body Works common stock, Lead Plaintiff and other members of the Class purchased Bath & Body Works common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Bath & Body Works common stock at such artificially inflated prices. As set forth herein, when the true facts

were subsequently disclosed, the stock price declined precipitously, and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

305. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

306. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

307. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of § 20(a) of the Exchange Act.

308. The Individual Defendants had control over Bath & Body Works and made the materially false and misleading statements and omissions on behalf of Bath & Body Works within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and culpable participation in the fraud, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

309. The Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Additionally, to the extent necessary, the Individual Defendants actually exercised control over Bath & Body Works, including by, among other things, directing the Company to issue materially false and misleading statements to the investing public in group-published and other materials.

310. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with purchasing the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

DATED: July 28, 2026

Respectfully submitted,

*s/ Mark H. Troutman*

**TROUTMAN & JUDGE LLC**
Mark H. Troutman (0076390), Trial Attorney
Shawn K. Judge (0069493)
1700 Lake Shore Drive, Suite 220
Columbus, OH 43204
Telephone: (740) 866-0630
Facsimile: (740) 866-0636
mtroutman@troutmanjudge.com
sjudge@troutmanjudge.com

*Liaison Counsel for Lead Plaintiff West Virginia Investment Management Board*

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Jacqueline R. Meyers (admitted *pro hac vice*)
Stephen C. Boscolo (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
jmeyers@labaton.com
sboscolo@labaton.com

*Counsel for Lead Plaintiff West Virginia Investment Management Board*